**In re UNION MEETING PARTNERS, a Pennsylvania general partnership, Debtor.**

**UNION MEETING PARTNERS, Plaintiff,**

**v.**

**LINCOLN NATIONAL LIFE INSURANCE CO., Defendant.**

**Bankruptcy No. 92–17118DAS.**
**Adv. No. 93–0848DAS.**

United States Bankruptcy Court, E.D. Pennsylvania.

Jan. 6, 1994.

---

Aris J. Karalis, Ciardi & DiDonato, Philadelphia, PA, for debtor/plaintiff.

J. Scott Victor, Saul, Ewing, Remick & Saul, Philadelphia, PA, for Lincoln Nat. Life Ins. Co.

Frederic Baker, U.S. Trustee, Philadelphia, PA.

*OPINION*

DAVID A. SCHOLL, Bankruptcy Judge.

*A. INTRODUCTION*

The instant adversary proceeding ("the Proceeding") arises as a result of our previous decision of November 1, 1993, reported at 160 B.R. 757 (*"Union Meeting I"*), denying confirmation of competing plans proposed by UNION MEETING PARTNERS ("the Debtor") and by the Debtor's principal secured creditor, LINCOLN NATIONAL LIFE INSURANCE CO. ("Lincoln"). In Union Meeting I, we denied confirmation of the Debtor's Plan because the Debtor sought to utilize the rents which Lincoln had demanded in writing from the Debtor's tenants pre-petition, and hence were not the Debtor's property, per the recent decision in *Commerce Bank v. Mountain View Village*, 5 F.3d 34, 38–39 (3rd Cir.1993). *Union Meeting I*, 160 B.R. at 765–68. In the Proceeding, the Debtor seeks to avoid the effect of the rent demands upon the Debtor's tenants and a previous confessed judgment obtained by Lincoln on its debt ("the Judgment") as preferences.

We find that the rent demands and Judgment at issue, though "transfers," are not avoidable because Lincoln did not receive more as a result of these transfers than it would have if the transfers had not occurred and the Debtor's bankruptcy estate had been liquidated under Chapter 7. We also find that, by including the assets of the general partners in the calculation, as the Code, at 11 U.S.C. § 101(32)(B) requires, the Debtor was not insolvent at the time of the transfers. Thus, we conclude that the Debtor's efforts cannot prevail because it failed to meet the requirements of 11 U.S.C. §§ 547(b)(5) and (b)(3), respectively, regarding both transfers. Consequently, we also find that the rent funds held by Lincoln are not property of the Debtor's estate, and, therefore, are not subject to turnover to the Debtor pursuant to 11 U.S.C. § 542.

*B. FACTUAL AND PROCEDURAL HISTORY*

The Debtor, a Pennsylvania general partnership whose sole assets are two office buildings known collectively as the "Union Meeting One Corporate Center," located at 920A and 920B Harvest Drive, Blue Bell, Pennsylvania ("the Property"), filed the underlying voluntary Chapter 11 bankruptcy case on November 17, 1992 ("the Petition Date"). The history of this case, and the facts pertinent thereto, are set forth in *Union Meeting I*, 160 B.R. at 761–65, and will not be repeated here except as are necessary to understand the resolution of the Proceeding and to relate significant events occurring after November 1, 1993.

As noted previously, we denied confirmation of both plans before us in *Union Meeting I*, the Second Amended Plan of Reorganization proposed by the Debtor ("the Debtor's Plan") and the Amended Plan of Reorganization presented by Lincoln ("Lincoln's Plan"). We denied confirmation of Lincoln's Plan because Lincoln failed to consider prior municipal and tax claims in valuing its own secured claim, and because Lincoln was allowed its own unsecured claim even though its claim was non-recourse and it was to

receive the Property under the terms of that Plan. *Id.* at 768–71. However, we further found that Lincoln was quite capable of presenting a confirmable plan which could correct these deficiencies. *Id.* at 775–76.

By way of contrast, we found that the Debtor's Plan suffered from far more serious infirmities. We denied confirmation of the Debtor's Plan because it was funded by rents from its tenants which we determined were Lincoln's property and was thus infeasible. This holding followed from the fact that Lincoln, like the mortgagees in *Mountain View,* had sent a pre-petition letter of October 20, 1992, to the Debtor's tenants demanding the payment of rents to it, following the entry of the Judgment in foreclosure against the Property on October 5, 1992. *Union Meeting I,* at 762, 765–68. In so holding, we acknowledged that the facts of *Mountain View* were somewhat distinguishable, because Lincoln had sent the demand letters to the tenants within 90 days of the Debtor's bankruptcy filing and the *Mountain View* court had thusly suggested, 5 F.3d at 38, that this factor might be significant:

> Another complication is also absent here—the banks both served notices on the tenants and began receiving rents more than 90 days before the debtor filed its Chapter 11 petition. Consequently, we note that, even if the preference provisions of the Bankruptcy Code, 11 U.C.C. § 547, were otherwise relevant to this case, they need not be discussed under these circumstances.

In *Union Meeting I,* we held that the fact that the sending of the demand letters might be void*able* did not affect the letters' present effect, *Id.* at 766. We also expressed our pessimism regarding the ultimate success of a preference action similar to the Proceeding at issue, at *id.:*

> Furthermore, there is some question in our mind as to whether Lincoln's act of making a demand for payment of rents is avoidable as a preference. To succeed in voiding this action, all of the prerequisites of 11 U.S.C. § 547(b) would have to be proven by the Debtor, not only the 90–day requirement set forth in 11 U.S.C. § 547(b)(4)(A), since the *Mountain View*

court states that a mortgagee's lien on rents attaches and is perfected, for Bankruptcy Code purposes, at the moment of execution, delivery and recordation of the instrument of assignment. [5 F.3d at 39]. Actions taken by secured creditors in the preference period are generally not avoidable in light of 11 U.S.C. § 547(b)(5). *See In re Lease–A–Fleet, Inc.,* 152 B.R. 431, 438 (Bankr.E.D.Pa.1993); and *In re Rimmer Corp.,* 80 B.R. 337, 339 (Bankr. E.D.Pa.1987).

In the Order accompanying Union Meeting I, we allowed any party wishing to file a further amended plan and disclosure statement consistent with our Opinion to do so by November 12, 1993. *Id.* 160 B.R. at 766. We scheduled hearings on December 8, 1993, to consider the propriety of any amended disclosure statements which might be filed pursuant to our Order.

On November 8, 1993, in response to the skepticism regarding its prospects for proposing a confirmable plan enunciated in Union Meeting I, the Debtor filed and served a motion for reconsideration and amendment of the Union Meeting I Order ("the Reconsideration Motion"), along with the Complaint commencing the Proceeding ("the Complaint"). The Debtor also filed a motion for expedited consideration of the Reconsideration Motion, which, *inter alia,* requested an order temporarily restraining any other party (notably Lincoln) from filing any further plan of reorganization at that time. Finally, the Debtor filed an application to reduce Lincoln's time to answer the Complaint, and to schedule an expedited trial on the Proceeding. By our Order dated November 9, 1993, we shortened the answer period to the Debtor's Complaint and scheduled an expedited trial on the matter on December 8, 1993, the proposed date for consideration of the disclosure statements accompanying any further amended plans. We did not, however, restrain the filing of a plan in competition with any plan of the Debtor. Therefore, on November 12, 1993, the Debtor filed its Third Amended Plan and accompanying disclosure statement and Lincoln filed its Second Amended Plan and accompanying disclosure statement.

The Reconsideration Motion presented two arguments. First, the Debtor contended that we had not properly considered the effect of the Fourth Cash Collateral Stipulation between the parties ("the Fourth Stipulation"). Specifically, the Debtor alleged that Lincoln waived its right to object to the Debtor's use of the rents because, in the Fourth Stipulation, Lincoln had agreed that, in the event that the Debtor was able to confirm a plan of reorganization over the objection of Lincoln, Lincoln would turn over the rents to the Debtor to be used in its reorganization. In return for this alleged waiver, Lincoln received monthly adequate protection payments in the amount of $41,250. The Debtor's second argument incorporated Count I of the Complaint, which seeks to avoid the effect of the rent demands as a preference. The Debtor argued that, by sending the rent demand letters, Lincoln was able to convert its security interest in the rents into an ownership interest, thereby "improving" its position within the period ninety (90) days before the Petition Date.

In response to the Debtor's argument in the Reconsideration Motion regarding the effect of the Fourth Stipulation, Lincoln argued that the Fourth Stipulation had expired of its own terms, following an extension through August 5, 1993. Indeed, this court indicated, in *Union Meeting I*, at 762, 766, that it had come to the same conclusion when considering confirmation of the parties' earlier Plans.

We were not persuaded by the Debtor's arguments, which focused upon the fact that Lincoln had continued to retain the $41,250 monthly payments after the expiration of the Fourth Stipulation and this court had continued to rely on the stipulation of value indicated therein, which it argued supported the conclusion that the Fourth Stipulation remained effective beyond August 5, 1993. Rather, we reaffirmed our initial holding that, although the parties had adhered to certain terms of the Fourth Stipulation after its expiration, there was no basis for considering this expired contract to remain totally in effect after its expiration. *See Straup v. Times Herald*, 283 Pa.Super. 58, 68, 423 A.2d 713, 718–19 (1980). Furthermore, we reiter-

ated our conclusion that the Debtor's *pending* preference action in the Proceeding did not render void the challenged actions of Lincoln. An Order denying the Reconsideration Motion was therefore entered on November 24, 1993.

On November 24, 1993, Lincoln also filed a motion to dismiss the Proceeding, with an accompanying memorandum of law ("the Motion to Dismiss"). In the Motion to Dismiss, Lincoln argues that Count I of the Complaint (alleging that the rent demands constituted a preference) failed to "state a claim" because the Debtor could not prove all the elements of § 547 of the Bankruptcy Code. Lincoln relied primarily on *Mountain View*, 5 F.3d at 37–39, and its impact on the Debtor's ability to meet its burden of proof under § 547(b)(5) in making this argument. Lincoln also assailed Count II of the Complaint (claiming that Lincoln's Judgment also constituted an avoidable preference) on similar grounds. Finally, Lincoln argued that the Debtor was not entitled to the relief requested in Count III of the Complaint (seeking turnover of the rents) because the rents were not property of the Debtor's estate.

Upon receipt of the Motion to Dismiss, we entered an Order on November 24, 1993, permitting the Debtor to file a response to it by December 3, 1993. In a supplemental Order dated November 29, 1993, we required Lincoln to file an Answer to the Debtor's Complaint by December 3, 1993, as well. The Answer reiterates the defenses previously raised by Lincoln in the Motion to Dismiss. Additionally, in its first and second affirmative defenses; respectively, Lincoln asserts that the Debtor was not insolvent at the time of the transfers, and that neither the Judgment nor the sending of the rent demands constituted "transfers" of interests of the Debtor in property. On December 8, 1993, we approved both parties' new disclosure statements and scheduled hearings to consider confirmation of both new plans on January 18, 1994. Also on December 8, 1993, at the trial of the Proceeding, the parties offered to submit to the court a stipulation of facts ("the Stipulation of Facts") which would serve as the entire record of the Proceeding. We accepted this offer, and, consistent with

the schedule suggested by the parties, in an Order dated December 9, 1993, directed the parties to file the Stipulation of Facts by December 13, 1993. We also directed the parties to file any further Briefs in support of their respective positions by December 20, 1993.

When the parties failed to submit the Stipulation of Facts by December 17, 1993, we had no alternative but to enter an Order rescheduling the trial of the Proceeding on a must-be-tried basis on December 23, 1993. We also noted, in that Order, that we still expected the parties to file their Briefs by December 20, 1993, which they did. On December 23, 1993, the parties appeared and finally submitted the Stipulation of Facts in lieu of testimony. After a short colloquy with interested counsel, we determined that additional briefing on certain issues raised by counsel might be helpful. Therefore, we allowed the parties a final opportunity to submit additional supplemental Briefs on or before December 28, 1993.

## C. DISCUSSION

### 1. LINCOLN'S DISPATCH OF THE RENT DEMAND LETTERS TO THE DEBTOR'S TENANTS EFFECTED A "TRANSFER" OF A "PROPERTY INTEREST OF THE DEBTOR"

The preference provisions of the Bankruptcy Code invoked by the Debtor as to Counts I and II of the Complaint provide in pertinent part, at 11 U.S.C. § 547(b), as follows:

(b) Except as provided in subsection (c) of this section, the trustee may avoid any transfer of an interest of the debtor in property—

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made—

(A) on or within 90 days before the date of the filing of the petition; . . .

(5) that enables such creditor to receive more than such creditor would receive if—

(A) the case were a case under chapter 7 of this title;

(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

We must first determine whether the delivery of Lincoln's rent demands constituted a "transfer" of an "interest of the debtor in property" as required by the preamble of 11 U.S.C. § 547(b). See In re Vogue Coach Co., 132 B.R. 454, 457 (Bankr.N.D.Okla.1991). The definition of transfer contained in the Bankruptcy Code, at 11 U.S.C. § 101(58)[54], is very broad and includes "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with property or with an interest in property, including retention of title as a security interest. . . ."

Unfortunately, the Bankruptcy Code does not provide a definition of the phrase "interest of the debtor in property," although this phrase is used several times in the Bankruptcy Code. See, e.g., 11 U.S.C. §§ 547(b), 548(a). We must, therefore, turn to applicable state law, e.g., the law of Pennsylvania, to determine whether the Debtor had an interest in property which was transferred as a result of the sending of the rent demand letters. See Butner v. United States, 440 U.S. 48, 54–55, 99 S.Ct. 914, 917–18, 59 L.Ed.2d 136 (1978) ("property interests are created and defined by state law"); In re M & L Business Machine Co., 160 B.R. 851, 856 (Bankr.D.Colo.1993) (property rights not expressly determined by the Bankruptcy Code itself are established by state law); and In re Pearson Industries, Inc., 142 B.R. 831, 840 (Bankr.C.D.Ill.1992) (same).

The bankruptcy judges of this district held in the past that a mortgagee which took an assignment of rents in the mortgage documents must additionally take actual or constructive possession of rents in order to "perfect" its security interests in those rents. See In re Wynnewood House Associates, 121

B.R. 716, 721–26 (Bankr.E.D.Pa.1990) (FOX, J.); and *In re TM Carlton House Partners, Ltd.,* 91 B.R. 349, 352–55 (Bankr.E.D.Pa. 1988). Under this analysis, it is easy to conceive that a mortgagee would have received an avoidable preference when it took constructive possession of rents by sending demand or attornment letters to its debtor-mortgagor's tenants within the ninety (90) days preceding the debtor's bankruptcy. There is no question that perfecting a security interest during the ninety (90) day period prior to the filing of a bankruptcy petition can be a preference in accordance with 11 U.S.C. § 547(b) and 11 U.S.C. § 547(e). *See, e.g., In re Camp Rockhill, Inc.,* 12 B.R. 829, 832–33 (Bankr.E.D.Pa.1981); and 4 COLLIER ON BANKRUPTCY, ¶ 547.16[4], at 547–71 (15th ed. 1993).

■ As we noted in *Union Meeting I,* 160 B.R. at 766, however, *Mountain View* is a controlling precedent which has ruled that a mortgagee's lien on rents arises when a mortgage containing an assignment of rents clause or another documents of like effect are duly recorded, and that any subsequent lien, including, presumably, the lien of a bankruptcy trustee as a bona fide purchaser pursuant to 11 U.S.C. § 544, would be junior to the lien of the mortgagee. 5 F.3d at 38–39. This decision is consistent with the recent trend of both bankruptcy and appellate courts, including courts in this district, expanding the rights of mortgagees taking rent assignments. *See, e.g., In re SeSide Co., Ltd.,* 152 B.R. 878, 883–85 (E.D.Pa.1993) (disagreeing with *Wynnewood House* and *Carlton House* ); *In re Middleton Place Associates,* Bankr.No. 91–15134F, slip op. at 34–37 (Bankr.E.D.Pa. Dec. 21, 1993) (Judge Fox "retreats" from his conclusions in *Wynnewood House* in light of *Mountain View* ). *See also In re Vienna Park Properties,* 976 F.2d 106 (2d Cir.1992) (establishing similar principles in a neighboring Circuit); *Prudential Ins. Co. v. Boston Harbor Marina Co.,* 159 B.R. 616 (D.Mass.1993) (declining to follow precedent to the contrary in *In re Prichard Plaza Associates, L.P.,* 84 B.R. 289 (Bankr.D.Mass.1988)); and *Midlantic Nat'l Bank v. Sourlis,* 141 B.R. 826 (D.N.J.1992) (establishing similar principles in a neighboring state in this Circuit). *But see In re River Village Associates,* 161 B.R. 127, 133–34 (E.D.Pa.1993) ("*River Village II* "); and *In re River Village Associates,* 1993 WL 243897, slip op. at *5–*6 (E.D.Pa.1993) ("*River Village I* ") (this court refuses to reach a similar conclusion regarding Delaware law).

Although we have some misgivings regarding the soundness of *Mountain View* holdings and we are not convinced that the repercussions it will have on single asset bankruptcies-debtors are, on balance, fair to all players in the bankruptcy system, we are nonetheless bound by its dictates. It is thus clear that Lincoln had a senior lien on the rents at the time it recorded its mortgage and its assignment of rents and profits, which the parties, in the Stipulation of Facts, agree was duly accomplished on May 24, 1988. Therefore, the sending of the rent demands did not "perfect" Lincoln's interest in the rents, which had been perfected on May 24, 1988, and did not constitute a preference for that reason.

■ We now turn to the Pennsylvania state law, as we are required to do, in order to determine if the sending of the rent demands resulted in some other parting of an interest of the Debtor in its property. It is obvious that once the Debtor's tenants started paying the rents to Lincoln as a result of the demands, the Debtor, at a minimum, was deprived of its right to possess and use the rents. State law bears this out. In the case *Colbassani v. Society of Christopher Columbus,* 159 Pa.Super. 414, 48 A.2d 106 (1946), a mortgagee, having obtained a judgment against its mortgagor, issued a writ of attachment execution against both the mortgagor and the tenant of the mortgaged property as garnishee. The mortgagee then sought to obtain all rents due and to become due from the tenant. 159 Pa.Super. at 416, 48 A.2d at 106. The mortgagor and the intervening tenant petitioned to have the writ stayed. *Id.* The trial court stayed the writ and the mortgagee appealed. *Id.* In resolving the appeal, the court noted that

[t]he mortgage in this case contained a clause: "Together with . . . the rents . . . thereof." This is but a pledge and under such a clause where there is no default in

the mortgage, *the mortgagor, and not the mortgagee, is entitled to the rents.* If the mortgage becomes in default, the mortgagee can destroy the mortgagor's right to the rents by suing out the mortgage, by bringing ejectment, by entering into possession of the premises, *or by giving the tenant formal notice to pay the mortgagee.* Any of these steps results in the pledge being reduced to possession by the pledgee-mortgagee and entitles the latter to the rents.

159 Pa.Super. at 416, 48 A.2d at 107 (emphasis added). *Accord Fogarty v. Shamokin & Mount Carmel Transit Co.,* 367 Pa. 447, 550–51, 80 A.2d 727, 728–29 (1951); *Miners Savings Bank of Pittston v. Thomas,* 140 Pa.Super. 5, 10–11, 12 A.2d 810, 813 (1940); *Bulger v. Wilderman & Pleet,* 101 Pa.Super. 168, 176–80 (1930).

From the foregoing, we can conclude only that the Debtor's right to use the rents prior to Lincoln's enforcement of its lien is "an interest of the debtor in property." *Cf. M & L Business, supra,* 160 B.R. at 856, ("It is elemental property law that one of the 'interests in property' included in the total bundle of property rights is the right of possession."); *In re Bell & Beckwith,* 64 B.R. 620, 630 (Bankr.N.D.Ohio 1986) ("The right to possession is a proprietary interest in property which can, if transferred, serve as the basis of an action under 11 U.S.C. Section 548(a)"); H.R.REP. NO. 595, 95th Cong., 1st Sess. 314 (1977), U.S.Code Cong. & Admin.News 1978 pp. 5787, 6271 ("House Report") ("The definition of transfer is as broad as possible.... Under this definition, any transfer of an interest in property is a transfer, including a transfer of possession, custody or control even if there is no transfer of title, because possession, custody, and control are interests in property.") *Accord,* S.REP. NO. 989, 95th Cong., 2d Sess. 27 (1978), U.S.Code Cong. & Admin.News 1978 p. 5813. *See also In re Grove Peacock Plaza, Ltd.,* 142 B.R. 506, 513 (Bankr.S.D.Fla.1992). *Cf. In re Pinto,* 89 B.R. 486, 496 (Bankr.E.D.Pa. 1988) ("transfer" is broadly defined for purposes of 11 U.S.C. § 548).

2. *THE DEBTOR, WHO HAS THE BURDEN OF PROVING ALL OF THE ELEMENTS OF SECTION 547(b), FAILED TO ESTABLISH THAT THE SENDING OF THE RENT DEMAND LETTERS ALLOWED LINCOLN TO RECEIVE MORE THAN IT WOULD HAVE IN A HYPOTHETICAL CHAPTER 7 CASE, AS REQUIRED BY SECTION 547(b)(5)*

In light of our conclusion that an interest of the Debtor in property was transferred at the time Lincoln sent the rent demands to the Debtor's tenants, we must now determine if the remaining requirements of 11 U.S.C. § 547(b) are met. The plaintiff in a § 547 proceeding bears the burden of proving all of the elements of 11 U.S.C. § 547(b). *See* 11 U.S.C. § 547(g) ("For the purposes of this section, the trustee has the burden of proving the avoidability of a transfer under subsection (b) of this section...."); *Decatur Contracting v. Belin, Belin & Naddeo,* 898 F.2d 339, 345 n. 5 (3rd Cir.1990); and *Lease-A-Fleet, supra,* 151 B.R. at 346–49. The Debtor's duty to meet its burden under 11 U.S.C. § 547(b)(5) was highlighted in our decision in *Lease-A-Fleet,* where the debtor failed to prevail even though the underlying facts appeared to support its position, and by the decision in *Mellon Bank, N.A. v. Metro Communications, Inc.,* 945 F.2d 635, 641–44 (3rd Cir.1991), *cert. denied sub nom. Committee of Unsecured Creditors v. Mellon Bank,* —— U.S. ——, 112 S.Ct. 1476, 117 L.Ed.2d 620 (1992). Because we do not believe that the Debtor met this burden, we will examine this subsection first.

Section 547(b)(5) requires the bankruptcy court to "undo" the transfers in question and then construct a hypothetical liquidation of the debtor as of the petition date to determine whether the defendant-creditor received more as a result of the transfers than it would have received in a Chapter 7 liquidation case. The plaintiff, to satisfy § 547(b)(5), must show that the creditor was preferred in some amount, and it cannot succeed if it is proven that (1) the creditor was fully secured; (2) the transfer was nothing more than a seizure of the secured credi-

tor's collateral; or (3) the unsecured creditors would be paid in full in a Chapter 7 case. *In re Prescott,* 51 B.R. 751, 754 & n. 1 (Bankr.W.D.Wis.1985), *aff'd,* 805 F.2d 719 (7th Cir.1986). *See also Lease–A–Fleet, supra,* 151 B.R. at 349.

Lincoln's debt is not fully secured. The parties have stipulated that, as of the Petition Date, the amount of Lincoln's loan was at least $9,364,186.65. The parties have also stipulated that the value of the Property at the time Lincoln sent the rent demands, which was less than one month before the Petition Date, was no more than $6,762,000. Thus, if Lincoln received pre-petition rents as a result of its sending the rent demand letters, it might be shown that it reduced the amount of the unsecured portion of its claim thereby.[1] *See Lease–A–Fleet, supra,* 151 B.R. at 351; and 4 COLLIER, *supra,* ¶ 547.-08, at 547–43 to 547–44 (a payment to an undersecured creditor during the preference period may constitute a preference if the payment does not result in a corresponding reduction of that creditors' lien, or a corresponding increase in the debtor's equity in that creditor's collateral). This situation would be analogous to an accounts receivable lender improving its collateral position within the ninety (90) days before its borrower's bankruptcy. *See* 11 U.S.C. § 547(c)(5). Al-

though the Debtor suggests this very scenario in its Supplemental Brief, the record is devoid of any evidence regarding the amount of rents which might have been collected by Lincoln pre-petition. Given the close proximity between the date that the rent demands were sent to the Debtor's tenants and the Petition Date, it is certainly possible that all rents collected by Lincoln after it sent the demand letters were post-petition rents. The Debtor has not proven to the contrary.[2]

■ As noted above, in light of the *Mountain View* holding that a mortgagee's security interest in rents is perfected upon the recording of a document containing a rent assignment, Lincoln's interests in the rents has been perfected, for bankruptcy purposes, since May 24, 1988. Thus, in a hypothetical liquidation of the Debtor on the Petition Date, which is the date as of which the hypothetical liquidation must be constructed, *see In re Tenna Corp.,* 801 F.2d 819, 821–23 (6th Cir.1986); *Grove Peacock Plaza, supra,* 142 B.R. at 517; and *Rimmer, supra,* 80 B.R. at 339–40, Lincoln would be entitled to the entire value of the Property, including any value attributable to the rental income stream, whether it had sent the rent demand letters or not.[3]

1. The Stipulation of Facts contains nothing regarding the anticipated payment to unsecured creditors if the Debtor were liquidated. Because this missing piece of information is not pivotal to our decision, we will assume for the purposes of our analysis that the unsecured creditors will not receive full payment of their claims. *But see In re E & S Comfort, Inc.,* 92 B.R. 616, 619–20 & n. 3 (Bankr.E.D.Pa.1988) (failure to prove that unsecured creditors would receive less than full payment in a Chapter 7 case is a necessary element of proof of a preferential payment to an unsecured creditor under § 547(b)(5)).

2. Even if Lincoln did collect some pre-petition rents, the amount of those rents collected must have been rather modest. Because the rent demands were sent on October 20, 1992, and the Debtor's bankruptcy was filed on November 17, 1992, the only possible pre-petition rents which might have been collected by Lincoln would have been the rents for the month of November, 1992, and any delinquent rents paid at that time. Although the collection of these pre-petition rents, if proven by the Debtor, might have constituted a preference, the Debtor would have been entitled to recover only the amount of these pre-petition rents as a preference. *See, e.g., In re Paris Indus-*

*tries Corp.,* 130 B.R. 1, 3–4 (Bankr.D.Me.1991) (only that portion of the transfer attributable to the undersecured creditor's unsecured claim could be recovered as a preference).

However, any recovery by the Debtor is barred by our subsequent finding that it failed to meet the criterion of proving its insolvency, set forth in 11 U.S.C. § 547(b)(3), at all relevant points in time. *See* pages 239–40 *infra.* More importantly for the Debtor's purposes, this result would neither undermine Lincoln's security interest in the rents nor allow the Debtor to wrest control of the rents from Lincoln, as would be necessary to permit the Debtor to propose a confirmable plan.

3. If the hypothetical liquidation occurred at some other time, particularly after the Petition Date (for example, at the time of the trial on the adversary proceeding), it would have been possible to construct a hypothetical, albeit a tenuous one, wherein Lincoln would be better off as a result of the transfers. For example, if the hypothetical Chapter 7 trustee requested and was granted use of Lincoln's cash collateral (*i.e.* the rents) which resulted in a hypothetical failure of adequate protection, Lincoln's recovery in the

The Debtor, as might be expected, argues that, while *Mountain View* supports Lincoln's position on the § 547(b)(5) issue in establishing that its security interest in the rents was perfected long before the 90–day preference period commenced, the very presence of the paragraph from that Opinion quoted at page 232 *supra* suggests that the fact that notices to tenants were provided in the 90–day preference period may well be significant. In fact, there appears to be no reason for the *Mountain View* court to have even mentioned this factor unless it believed that it *was* significant.

There is some logical force to this argument. However, the *Mountain View* language in issue does not state that the preference provisions of the Code *would* be implicated if the rent demand letters had been dispatched within the 90–day period, but only that they are *not* implicated if the demands were made prior to the 90–day period.

The few cases which have discussed the preference issue have reached their conclusions on whether the requirements of § 547(b)(5) have been satisfied solely on the basis of whether the respective mortgagees' security interests in rents were deemed perfected prior to the dispatches of demands for rents from tenants.

Thus, in the one decision in which the result favors the debtor, and a preference regarding certain rent payments, was found, *In re Meridith Millard Partners*, 145 B.R. 682, 687 (D.Colo.1992), *aff'd*, 12 F.3d 1549 (10th Cir.1993), the result is driven by the district court's acceptance of the bankruptcy court's conclusion that, under the applicable state law of Colorado, the secured lender "did not perfect its interests in the rents until the post-petition filing of its notices [to the tenants] pursuant to 11 U.S.C. § 546(b)." *Id.*

However, in two cases in which the perfections of the security interests of the respective mortgagees were found to have occurred, under applicable state laws of Utah and New York, respectively, at the times of the recordings of the documents providing for an assignment of rents, the debtors were found incapable of avoiding the respective mortgagees' interests in the rents. *In re SLC Ltd. V*, 152 B.R. 755, 764–65 (Bankr. D.Utah 1993); and *Financial Center, supra*, 140 B.R. at 832–34.[4]

There is no question that *Mountain View* determined that, under Pennsylvania law, a mortgagee's security interest in rents is perfected upon recordation of the pertinent security documents. Therefore, we cannot follow *Meridith Millard* under its own reasoning, and we are obliged to reach a conclusion consistent with that attained in *SLC* and *Financial Center*.

Thus, we are constrained, by the reasoning of *Mountain View*, to conclude that the Debtor has not proven that Lincoln would receive more in a Chapter 7 liquidation on account of its claim as a result of the dispatch of the rent demand letters. Therefore, we must conclude that the Debtor has failed to met its burden necessary to establish a

---

hypothetical Chapter 7 case might be less than its recovery in the actual Chapter 11 as a result of the transfers. *Cf. In re Financial Center Associates of East Meadow, L.P.*, 140 B.R. 829, 834 (Bankr.E.D.N.Y.1992) (if the trustee in the hypothetical Chapter 7 liquidation had been interested in using the rents, it would have had to have provided the secured creditor with some form of adequate protection). A liquidation analysis as of any other point in time but the Petition Date, however, would be contrary to case law and would subject the 11 U.S.C. § 547(b) analysis to the whim of the trustee or the debtor-in-possession. Moreover, the language of § 547(b)(5) requires a transfer which "enables [a] creditor ... to receive ..." more, not one which *might* enable a creditor to receive more.

4. This court does not necessarily subscribe to the *Financial Center* court's analysis of when a security interest in rents is perfected under New York law. *See In re 641 Associates*, 140 B.R. 619, 627–28 (Bankr.E.D.Pa.1992). This court recently was asked to determine the right of the *641 Associates* Chapter 7 trustee to the rents vis-a-vis the mortgagee. However, since this court had previously granted relief from the automatic stay to the mortgagee, we decided that this issue should be resolved by the New York state courts. *In re 641 Associates*, 1993 WL 484221 (E.D.Pa. 1993). What is important for purposes of this discussion is the analysis of the *Financial Center* court that, if a rent assignment is perfected upon recordation of the documents including the security interest, then the rent demand letters to tenants cannot be avoided as a preference.

preference arising under 11 U.S.C. § 547(b)(5).

3. *THE DEBTOR HAS ALSO NOT PROVEN THAT IT WAS INSOLVENT AT THE TIME THE RENT DEMAND LETTERS WERE SENT TO ITS TENANTS BY LINCOLN, NOTWITHSTANDING THE INITIAL PRESUMPTION OF INSOLVENCY IN ITS FAVOR*

In addition to concluding that the Debtor has not met its burden of proving the element required by 11 U.S.C. § 547(b)(5), we find that the Debtor has also not proven that it was insolvent at the time of the transfers, as required by 11 U.S.C. § 547(b)(3).

The Bankruptcy Code, at 11 U.S.C. § 101(32)(B), defines the insolvency of a partnership as the

financial condition such that the sum of such partnership's debts is greater than the aggregate of, at a fair valuation—

(i) all of such partnership's property ...; and

(ii) the sum of the excess of the value of each general partner's nonpartnership property ... over such partner's nonpartnership debts....

■ The Debtor has the ultimate burden of proof on this issue as well, it is aided by a statutorily-created presumption of insolvency in its favor within the 90–day preference period. 11 U.S.C. § 547(f). However, if the party opposing the claim of a preference produces evidence to meet or rebut the presumption, then the presumption disappears completely and the burden of proving insolvency reverts to the Debtor. *See In re Old World Cone Co.,* 119 B.R. 473, 476–78 (Bankr.E.D.Pa.1990). *See also, e.g., In re Taxman Clothing Co.,* 905 F.2d 166, 168 (7th Cir.1990); *In re Koubourlis,* 869 F.2d 1319, 1322 (9th Cir.1989); and *In re Emerald Oil Co.,* 695 F.2d 833, 837–38 (5th Cir.1983).

The parties have agreed, in the Stipulation of Facts, that, at the time Lincoln sent the rent demands, the Debtor's assets totaled no more than $6,762,000, and the Debtor's liabilities totaled approximately $10 million. These facts would indicate that the Debtor,

standing alone, was insolvent on the crucial date of the transfer.

However, the parties have also attached to the Stipulation of Facts certain financial statements of the Debtor's five general partners, identified by their names and respective holdings in *Union Meeting I, supra,* 160 B.R. at 763, ("the General Partners"). These financial statements declare that each of the General Partners has a substantial net worth. Specifically, the parties have stipulated that, at the time that the rent demands were sent, the General Partners' nonpartnership assets exceeded their nonpartnership debts by approximately $44 million.

It is also to be noted that the Stipulation of Facts provides that, if the General Partners were called to testify, they would each state that they have contingent guaranty liabilities totaling, in the aggregate, approximately $23 million. It is also stipulated that the General Partners would testify to their belief that they would experience adverse tax consequences if they were forced to liquidate their assets.

We conclude from these Stipulations, for the purposes of our analysis, that the General Partners have additional nonpartnership debts which, though contingent, can be valued at $23 million. Since we are accepting the $23 million debt figure, notwithstanding the contingent nature of these liabilities, we are unwilling to deduct anything more from this figure in consideration of the General Partners' "belief" that they would incur tax liabilities if forced to liquidate their assets. Thus, the remaining nonpartnership assets of the General Partners totals approximately $21 million. When added to the Debtor's assets of over $6.7 million, the total assets exceed the Debtor's liabilities of about $10 million by $17.7 million.

■ The Debtor argues that the General Partners' nonpartnership assets should not be included in the insolvency calculation because Lincoln's debt is nonrecourse and Lincoln would not have access to the General Partners' assets to ensure repayment of its debt. In other words, the Debtor would have us recognize a condition in application of 11 U.S.C. § 101(32)(B)(ii) which would

prevent us from considering a general partner's nonpartnership assets when determining insolvency unless nonbankruptcy partnership law would otherwise permit the creditor to resort to such assets. In support of this argument, the Debtor cites to legislative history of the insolvency definition wherein it is stated that "[f]or a partnership, the definition is modified to account for the liability of a general partner for the partnership's debts." House Report, *supra*, at 312, U.S.Code Cong. & Admin.News 1478 at 6264. Thus, the Debtor reasons, if a general partner has no individual liability for a particular partnership debt, then the partner's nonpartnership assets should not be added to the mix of the Debtor's assets in the calculation of the Debtor's insolvency.

██ Although the Debtor's argument is not without logical and equitable appeal, 11 U.S.C. § 101(32)(B) is not ambiguous, and we are thus not at liberty to create conditions which do not appear in the text of the statute. The few cases construing this Code section do not indicate a willingness to append any such conditions to the Code, *see In re Davis*, 120 B.R. 823, 825 (Bankr.W.D.Pa. 1990); and *In re Writing Sales, L.P.*, 96 B.R. 175, 177 (Bankr.E.D.Wis.1989). Also, the currently-in-vogue "plain language" theory of Bankruptcy Code interpretation, without resort to legislative history, would allow no such reading. *See Patterson v. Shumate*, — U.S. —, — – —, 112 S.Ct. 2242, 2246–48, 119 L.Ed.2d 519 (1992); *Taylor v. Freeland & Kronz*, — U.S. —, — – —, 112 S.Ct. 1644, 1648, 118 L.Ed.2d 280 (1992); and *Union Bank v. Wolas*, — U.S. —, —, —, 112 S.Ct. 527, 532, 534, 116 L.Ed.2d 514 (1991).[5]

Thus, in light of the "plain language" of § 101(32)(B), we must conclude that the Debtor has failed to meet its burden of proving that, at the time the rent demands were sent to its tenants, the Debtor was insolvent, as that term is defined in the Bankruptcy Code. Therefore, the Debtor has failed to meet its burden under 11 U.S.C. § 547(b)(3)

and could not avoid the effect of those demand letters even if we held in its favor on the more controversial § 547(b)(5) issue.

### 4. THE FOREGOING CONCLUSIONS BAR OUR GRANTING ANY RELIEF TO THE DEBTOR UNDER COUNTS II AND II OF ITS COMPLAINT, AS WELL AS COUNT I

Count I of the Complaint, in which the Debtor seeks to avoid Lincoln's interest in its rents, which was the downfall of the Debtor's Plan, is the heart of the Complaint. Indeed, Count II of the Complaint, which seeks to avoid the confessed judgment obtained by Lincoln against the Debtor prior to the rent demands, appears to have been abandoned by the Debtor, as it is not addressed again after a brief discussion in its Brief opposing the Motion to Dismiss.

Lincoln obtained the Judgment on October 5, 1992. As discussed above, Lincoln had, by that time, long since "perfected" its interest in the Property and the rents. The Debtor, in its brief discussion of the Judgment, has failed to articulate how Lincoln obtained any benefit from the Judgment which it would not also have received in a Chapter 7 liquidation case. We therefore have considerable doubt as to whether the Debtor has proven the element of § 547(b)(5) as to the Judgment's entry. The failure to prove this element is fatal to this claim, as with any preference claim. *See, e.g., E & S Comfort, supra*, 92 B.R. at 620; and *Lease–A–Fleet, supra*, 151 B.R. at 347–51. *Cf.* 4 COLLIER, *supra*, ¶ 547.03, at 547–20 ("The confession of a judgment on a nonpreferential and otherwise valid security interest in personal property and a subsequent sale of the property does not give rise to a preference."). *But cf. In re Road Patch Services, Inc.*, 154 B.R. 869, 872 (Bankr.E.D.Pa.1993) (a confessed judgment may be stricken as unconstitutional if the judgment creditor is unable to establish that the judgment debtor was sophisticated and knowledgeable about such matters and the contract containing a confessed judg-

---

5. Nor is this result without its own equity. It does not seem particularly just to force a nonrecourse creditor to give up the rents which it bargained for while not requiring the partner-ship's general partners, who may possess substantial unencumbered assets, to contribute to the partnership's reorganization.

ment was not negotiated between parties represented by counsel).

In any event, the Debtor's failure to prove its insolvency at the time of the entry of the judgment is fatal to the Debtor's success in Count II of the Complaint. We note that, since the Stipulation of Facts provides the financial condition of the Debtor and the General Partners at the time the rent demands were sent to the Debtor's tenants, it does not address this issue as of the time of the entry of the Judgment. However, these events were so close chronologically as to negate any possibility that the Debtor's and/or the General Partners' financial condition improved substantially between the time of the Judgment and the date the rent letters were sent two weeks later. Therefore, for essentially the same reasons we determined that the sending of the rent demand letters was not a preference as to Count I, we must also conclude that Lincoln was not preferred as a result of the entry of the Judgment as to Count II.

The third and final Count of the Debtor's Complaint seeks the turnover of the rents held by Lincoln. The Debtor relies on 11 U.S.C. § 542(a), which requires that

> an entity ... in possession, custody, or control, during the case, of property that the trustee may use, sell, or lease under section 363 of this title ... shall deliver to the trustee, and account for, such property or the value of such property, unless such property is of inconsequential value or benefit to the estate.

■■■■■ We concluded in *Union Meeting I*, 160 B.R. at 765–68, that the rents which were collected from the Debtor's tenants by Lincoln subsequent to the dispatch of the demand letters are Lincoln's property and cannot be used by the Debtor. Since the Debtor has failed in its attempt to avoid the effect of the rent demands or the Judgment as preferences, our earlier conclusion regarding Lincoln's entitlement to the rents remains unchanged. Because the rents are not property of the Debtor's estate, Lincoln is under no obligation to turn them over to the Debtor. *See, e.g., In re High Sierra Transport, Inc.,* 101 B.R. 432, 434 (Bankr.M.D.Pa. 1989). Even if the rents were not Lincoln's property, they would constitute at least Lincoln's cash collateral, and Lincoln would not have to turn them over to the Debtor without a proffer of adequate protection. *See* 11 U.S.C. § 542(a); 11 U.S.C. § 363(b)(1), (c)(2), (e); *In re Shapiro,* 124 B.R. 974, 982 (Bankr. E.D.Pa.1991); and *In re Ford,* 78 B.R. 729, 735–37 (Bankr.E.D.Pa.1987).

## D. CONCLUSION

We are unable to grant the Debtor any of the relief that it sought in any of the three Counts in this Proceeding and which it needed to formulate a confirmable plan. Presumably, Lincoln's Amended Plan will remain as the only plan which is a viable candidate for confirmation on January 18, 1994.[6]

### *ORDER*

AND NOW, this 6th day of January, 1994, upon consideration of the Stipulation of Facts submitted by the parties hereto in lieu of a testimonial record, and upon consideration of the various Briefs filed by the parties, it is hereby ORDERED AND DECREED as follows:

1. Judgment is entered in favor of the Defendant, LINCOLN NATIONAL LIFE INSURANCE CO., and against Plaintiff–Debtor, UNION MEETING PARTNERS.

2. The Complaint in this Proceeding is DISMISSED in its entirety.

---

**6.** As our choice of the secured creditor's competing plan in *River Village II, supra,* 161 B.R. at 142–44 indicates, it is not clear that the Debtor's Plan would have been confirmed even if it were confirmable.