### In re UNION MEETING PARTNERS, a Pennsylvania general partnership, Debtor.

### Bankruptcy No. 92–17118DAS.

United States Bankruptcy Court, E.D. Pennsylvania.

March 14, 1994.

---

Aris J. Karalis, Ciardi & DiDonato, Philadelphia, PA, for debtor.

J. Scott Victor, Saul, Ewing, Remick & Saul, Philadelphia, PA, for Lincoln Nat. Life Ins. Co.

Frederic Baker, Asst. U.S. Trustee, Philadelphia, PA.

## OPINION

DAVID A. SCHOLL, Bankruptcy Judge.

### A. INTRODUCTION

Presently before this court in the voluntary Chapter 11 bankruptcy case of UNION MEETING PARTNERS ("the Debtor") are (1) the Debtor's request that we confirm its Third Amended Plan of Reorganization ("the Debtor's Plan") over the opposition of its first mortgagee, Lincoln National Life Insurance Company ("Lincoln"); and (2) Lincoln's request that we confirm its own Second Amended Plan of Reorganization ("Lincoln's Plan") over the Debtor's objections.

We find that the Debtor's Plan cannot be confirmed because it seeks to use the rents ("the Rents") generated by the Debtor's only asset, two adjoining office buildings in Blue Bell, Pennsylvania ("the Property"), which belong to Lincoln. Because we find that Lincoln's interest extends to all portions of the Rents generated by the Property, none of the Rents can be used by the Debtor in conjunction with its Plan, even if they are used only to pay for the reasonable expenses of operating the Property. We also find that Lincoln's Plan cannot be confirmed because certain unsecured recourse creditors ("the Recourse Creditors"), who have voted against the plan, will not receive or retain property under the plan equal to or greater than the amount that such creditors would receive in a Chapter 7 liquidation.

At this juncture, both parties have had several bites at the confirmation apple and neither has yet succeeded in serving up a plan which is totally palatable. However, because Lincoln is now, even clearer than before, the only interested party who has proposed a plan with a possibility of confirmation, we will give Lincoln alone one last opportunity to propose a confirmable plan. To achieve confirmation, Lincoln will apparently have to pay the Recourse Creditors, whose claims allegedly total about $70,000, the same amount that they would receive in a hypothetical Chapter 7 liquidation, which appears to be 100% of their allowed claims. If Lincoln declines our invitation or is unable to confirm an amended plan, we will convert this case to a case under Chapter 7 of the Bankruptcy Code forthwith.

### B. FACTUAL AND PROCEDURAL HISTORY

The extensive history of this case, which documents the Debtor's tenacious efforts to regain control of the Rents from Lincoln, is set forth in great detail in our two previous opinions arising out of this case, *In re Union Meeting Partners,* 160 B.R. 757 (Bankr. E.D.Pa.1993) (*"Union Meeting I"*) (confirmation of both prior competing plans is denied); and *In re Union Meeting Partners,* 163 B.R. 229 (Bankr.E.D.Pa.1994) (*"Union Meeting II"*) (proceeding by which the Debt-

or attempted to avoid Lincoln's actions which allowed it to seize ownership of the rents is dismissed). Undaunted by the bleak landscape which appears on the horizon for its prospects of achieving confirmation of any plan in this case in light of Lincoln's non-avoidable pre-petition seizure of the Rents, the Debtor now seeks confirmation of its current Plan. Lincoln, likewise having failed to confirm an earlier version of its competing plan of reorganization, seeks confirmation of its Plan.

The Debtor's Plan is typical of those filed by debtors in single-asset bankruptcy cases. The Debtor seeks to restructure Lincoln's secured debt, stretch out the maturity date of Lincoln's note, and continue operating the Property in the hope of retiring the modified debt and creating/preserving equity for the Debtor's general partners ("the General Partners").[1] One important difference between the Debtor's situation and that of a single-asset debtor with a clear path to confirmation is that the Debtor has lost its ownership interest in and control of the Rents generated by the Property. *Union Meeting I,* 160 B.R. at 765–67. With all the Rents being applied to Lincoln's debt, the Debtor was relegated to either having its General Partners fund the costs of operation throughout the term of the Plan, or somehow regaining control of all or part of the Rents. The Debtor attempted and failed to assail Lincoln's interest in the Rents under the preference provisions of the Bankruptcy Code. *Union Meeting II,* 163 B.R. at 233–40. Despite this setback, the General Partners remain unable or unwilling to fund the costs of operating the Property. Thus, when the time came to file an amended plan, the Debtor proposed its current Plan, which incorporates the Debtor's "net rent theory."[2] Basically, the Debtor asserts that, according to the parties' Mortgage and Security Agreement ("the Mortgage") and the accompany-

ing Assignment of Rents and Profits ("the Rent Assignment"), Lincoln has bargained for, and is entitled to, only the rental income remaining after the payment of the necessary costs of the Property's operation ("the Net Rents"). This is the first juncture in the course of this case at which the Debtor has asserted that Lincoln's interest in the Rents is limited to the Net Rents.

The Debtor's Plan provides Lincoln with a secured claim in the amount of $6,392,280 and an unsecured claim in the amount of $2,972,281. The amount of the secured claim was fixed by subtracting $207,720, equal to certain property taxes which have accrued during the bankruptcy, from the agreed Property value of $6.6 million, as was approved in *Union Meeting I,* 160 B.R. at 767–68. No adjustment was made for either of two U.S. Healthcare leases which were entered into and approved by this court without objection after the Property was valued.

Pursuant to an amended, non-recourse promissory note, the Debtor is required to make monthly payments of principal and interest to Lincoln beginning on the first day of the first full month following the effective date of the Plan and ending on March 1, 2004. The monthly payments are to be equal to the amount of rental income remaining after the payment of "reasonable expenses, maintenance, repairs, management, escrow of real estate taxes and tenant fit out of the Property." The Net Rents will be applied, first to interest which accrues at the rate of nine and one eighth (9⅛%) percent; and the remainder, if any, to principal. Thus, Lincoln is not promised any set amount on a monthly basis. A balloon payment equal to all outstanding principal and interest is due on March 1, 2004. Until the debt is paid in full, Lincoln will retain the lien of its Mortgage. Lincoln is also entitled to all amounts remaining in a certain escrow account ("the

---

1. The identity and specific holdings of each of the General Partners are set forth in *Union Meeting I,* 160 B.R. at 763.

2. Actually, the Plan contains various alternatives triggered by the outcome of such contingencies as the result of the preference action, the disposition of Debtor's appeal of our Order in *Union Meeting I* denying confirmation of its second

amended plan of reorganization, and Lincoln's 11 U.S.C. § 1111(b) election. Based on the occurrence or non-occurrence of certain contingencies, and Lincoln's choice regarding its § 1111(b) election, only one Plan alternative remains before this court at present. Therefore, we will limit our discussion to this alternative set forth in the Debtor's Plan.

Suspense Account") after the payment of Lincoln's adequate protection claim and certain taxes. Lincoln's unsecured deficiency claim is treated similarly, but not in precisely the same manner, as other general unsecured claims. Although it is not clear, *see* page 567 *infra*, it appears that both Lincoln's secured and unsecured claims are classified together as the only claims in Class 1.

The claim of E.F. Hansen, Jr. and Eileen Hansen, the Debtor's second mortgagees ("Hansen"), is alone contained in Class 2. The entire amount of the Hansen's claim, fixed at $316,820, is in substance an unsecured deficiency claim and is treated in exactly the same manner as the claims of the general unsecured creditors.

The general unsecured creditors, as well as the deficiency claims of Lincoln and Hansen, will be paid five (5%) percent of their allowed claims within a year of the effective date of the Debtor's Plan. Moreover, the general unsecured creditors and Hansen (but not Lincoln) are entitled to an additional payment equal to fifteen (15%) percent of their allowed claims directly from the General Partners if they vote to accept Debtor's Plan and agree to release the General Partners from all liability. However, Lincoln is entitled to the additional payment from the General Partners only if it (1) agrees to treatment under a Plan alternative which would require it to relinquish its entitlement to the Rents; (2) declines its § 1111(b) election; (3) votes in favor of the Debtor's Plan; and (4) agrees to release the General Partners. The claims of the unsecured claimants comprise Class 6 of the Plan.

The General Partners' interests in the Debtor comprise Class 7 of the Plan. The General Partners are allowed to retain their respective interests in the Debtor if they contribute, in the aggregate, at least $200,000 on the effective date of the Plan. Under certain Plan alternatives, the General Partners are also required to make additional contributions over time toward the Plan's funding. The amounts of these future contributions vary depending on the alternative of the Plan which is confirmed.

Finally, the Debtor places the priority property tax claims in Class 3 and provides for payment of their principal, plus interest at seven (7%) percent, over the six years following the date of their assessment. Allowed administrative claims comprise Class 4, and all other allowed priority claims comprise Class 5. The Class 4 and Class 5 claimants are to be paid in full on the effective date of the Plan or within 30 days after their respective claims are allowed.

The Report of Plan Voting for the Debtor's Plan recites affirmative acceptance by Classes 2, 3 and 7; deemed acceptance by Classes 4 and 5; and rejection by Classes 1 and 6.

Lincoln has filed numerous objections to the Debtor's Plan. Once again, the focus of Lincoln's attack is directed towards the Debtor's proposed use of the Rents. Because we do not find that the parties' contract or the Pennsylvania common law supports Debtor's "net rent theory," we must sustain this objection and deny confirmation of the Debtor's Plan as infeasible. Lincoln's remaining objections are as follows: (1) the Debtor's Plan improperly values Lincoln's secured and unsecured claims; (2) Class 6 of the Plan provides dissimilar treatment for claims in the same class, in violation of 11 U.S.C. § 1123(a)(4); (3) the Debtor's Plan does not provide Lincoln with as much as it would have received on account of its claims in a Chapter 7 liquidation, in violation of 11 U.S.C. § 1129(a)(7); (4) no class of claims eligible as an impaired accepting class under 11 U.S.C. § 1129(a)(10) has accepted the Plan; (5) the interest rate to be paid to Lincoln on account of its secured claim is insufficient, in light of the Third Circuit's decision in *General Motors Acceptance Corp. v. Jones*, 999 F.2d 63 (3d Cir.1993); and (6) the Debtor's Plan violates the absolute priority rule, as codified in 11 U.S.C. § 1129(b)(2)(B).

Lincoln's Plan, also typical of a first mortgagee's competing plan in a single-asset bankruptcy case, contemplates the liquidation of the Property and the Debtor's other assets. Lincoln's secured claim is contained in Class 1, and it will receive, in full payment, the Property, all other assets and

causes of action of the Debtor, all funds contained in the Suspense Account, and adequate protection payments through the effective date of the Plan. In return, Lincoln will provide the funding necessary to consummate its Plan.

Class 5 contains all of the claims of the general unsecured creditors, as well as Hansen's unsecured deficiency claim. Each claimant in this class will receive a lump sum payment equal to thirty (30%) percent of its allowed claim on the effective date or within 30 days after its claim is allowed.[3]

The General Partners' interests in the Debtor comprise Class 6. On the effective date of Lincoln's Plan, the General Partners' interests in the Debtor will be cancelled.

The remaining classes of Lincoln's Plan comprise of the priority property tax claims (Class 2), the allowed administrative claims (Class 3), and all other allowed priority claims (Class 4). The claimants in each of these classes will receive full payment on the effective date or within 30 days after their claims are allowed.

The Certification of the Vote on Lincoln's Plan indicates affirmative acceptance by Class 1; deemed acceptance by Classes 2, 3 and 4; and rejection by Classes 5 and 6.

The Debtor has filed a number of objections to Lincoln's Plan. Debtor's primary objection is that Lincoln's Plan does not satisfy 11 U.S.C. § 1129(a)(7) with respect to the rejecting unsecured creditors with recourse against the General Partners because Lincoln's Plan only pays these creditors thirty (30%) percent of their allowed claims, whereas, in a Chapter 7 liquidation, these creditors would receive their pro rata share of the estate plus any deficiency from the General Partners pursuant to 11 U.S.C. § 723(a). We agree that a § 723(a) recovery must be taken into account when performing the § 1129(a)(7) comparison. In *Union Meeting II*, 163 B.R. at 238–40, we found, at Lincoln's request, that, within the 90 days before the Debtor's bankruptcy, the General Partners each had a substantial net worth.

As a result of this intervening development since *Union Meeting I*, where our reasons for denying confirmation of Lincoln's prior plan did not include a violation of § 1129(a)(7), we must now conclude that, pursuant to § 1129(a)(7), a § 723(a) recovery would have real value as to the Recourse Creditors and that the Debtor's objection on this score is well-founded. The Debtor's remaining objections, all of which have been raised before and rejected, are rejected again. They include the following: (1) Lincoln's Plan treats the General Partners' alleged loan to the Debtor as equity, thereby denying them the right to participate in and vote as members of the unsecured creditor class; (2) Lincoln's Plan is not fair and equitable as defined by 11 U.S.C. § 1129(b)(2)(B); and (3) Lincoln's Plan is not fair and equitable as defined by 11 U.S.C. § 1129(b)(2)(C).

A consolidated confirmation hearing on both the Debtor's Plan and Lincoln's Plan was conducted on January 23, 1994. The Debtor elicited testimony from its managing General Partner, Frank Iacobucci. Lincoln did not call any witnesses. Counsel for both parties presented extensive oral argument, primarily in support of their principal objections to the other party's Plan. Both parties were given an opportunity to submit additional briefing by February 11, 1994. Due to inclement weather, the parties were not able to file their Briefs until February 14, 1994.

## C. DISCUSSION

1. THE MOST SIGNIFICANT OF LINCOLN'S OBJECTIONS TO THE DEBTOR'S PLAN, BASED UPON THE DEBTOR'S PROPOSED USE OF THE PROPERTY'S RENTS, MUST BE SUSTAINED.

Lincoln's objections to the Debtor's Plan enumerate several of the Plan's alleged deficiencies, although Lincoln devoted its entire argument at the confirmation hearing to its objection regarding the Debtor's proposed use of the Rents to fund its post-confirmation operations. In these objections, Lincoln asserts that the Debtor is once again proposing

---

**3.** Lincoln has cured the defect of allowing itself an unsecured claim in addition to a right to obtain possession of the Property. This defect

prevented confirmation of its previous plan addressed in *Union Meeting I*, 160 B.R. at 768–70.

to operate the Property by utilizing the Rents which, according to our prior holdings in *Union Meeting I,* 160 B.R. at 765–67; and *Union Meeting II,* 163 B.R. at 241, are Lincoln's property. The Debtor, who was unable to "avoid" the effect of the ruling in *Commerce Bank v. Mountain View Village, Inc.,* 5 F.3d 34 (3rd Cir.1993), or Lincoln's interest in the Rents pursuant to 11 U.S.C. § 547, now argues that the loan contract between Debtor and Lincoln granted Lincoln an interest in only Net Rents, *i.e.,* the rental income remaining after the costs of property management, maintenance, repairs, and taxes have been met. Because the Debtor's Plan utilizes the Rents for only such expenses and turns over the remainder to Lincoln, the Debtor argues that its Plan provides Lincoln all for which it bargained.

We agree with the Debtor that the parties' contracts establish the scope of Lincoln's interest in the Rents, and, in the context of less clear documentation, these contracts could possibly limit the apparently broad sweep of the holding in *Mountain View, supra,* 5 F.3d at 38. However, based on the unambiguous language of the Rent Assignment and Mortgage in issue here, we conclude that Lincoln bargained for possession of the gross Rents in the event of a default by the Debtor. Although Lincoln reserved the option of using the Rents to pay the expenses of operating the Property under the terms of these documents, it did not bind itself to do so therein.

Because Lincoln's objection to the Debtor's use of the Rents is the focal point of its objections to the Debtor's Plan, and constitutes what is by far its most serious and fundamental objection to the Debtor's Plan, we will address that issue first. Lincoln's remaining objections, some of which are meritorious, others of which are not, and all of which may be addressed briefly, are considered thereafter.

a. THE DEBTOR'S PLAN IS NOT CONFIRMABLE BECAUSE IT CONTINUES TO ATTEMPT TO UTILIZE RENTS WHICH ARE LINCOLN'S PROPERTY.

■ As noted above, the Debtor asserts that the Rent Assignment and Mortgage

grant Lincoln an interest in only the Net Rents, and, therefore, contrary to Lincoln's objection, the Debtor may utilize the Rents in its Plan to fund the reasonable expenses of operation before turning over the balance to Lincoln. It is not always clear from the Debtor's submissions to this court whether it believes that this result follows from the terms of the parties' contractual documents or from Pennsylvania's common law governing the rights and duties of a mortgagee. In either case, the Debtor's argument lacks merit.

The excepts from the Rent Assignment which provide Lincoln with its rights in the Rents are as follows:

[Lincoln] is further authorized, *but shall not be obligated,* to pay taxes, assessments and charges on the [Property], to insure, repair, and/or improve the buildings located thereon, and to expend such sums as may be necessary to defend the title, on the [Property], or the use thereof, or to recover rents and profits, or to protect rental rights, and/or to make such other expenditures for said property *as it may in its sole discretion deem necessary, proper, or expedient.* [Lincoln] may, *but shall not be obliged to,* advance funds for any of the above purposes, and any amount so advanced shall be a first and prior claim on the rents and profits realized from the [Property], and shall be repaid to [Lincoln].... Should the rents and profits be insufficient to pay advances so made by [Lincoln], any unpaid balance shall become a part of the debt secured by the Mortgage and shall bear interest from the date of advancement at the Default Rate set out in the Note....

Rent Assignment, at 1–2 (emphasis added).

Any amount received or collected by [Lincoln] by virtue of this Assignment shall be applied as follows (*but not necessarily in the order stated* ) *the priority of payment of such items to be within the sole discretion of [Lincoln]:*

1. To the repayment to [Lincoln] of any and all amounts advanced by it under the terms of this Assignment, together with interest....

2. To the payment of taxes, assessments and charges and the expense of insurance, repairs to and improvements on the [Property]; *but [Lincoln] shall not be obligated to keep insurance on, make repairs to and/or improvements on the [Property].*

3. To the payment of all other necessary expenses of the management, protection and/or preservation of the [Property].

4. *To the payment of all amounts due or to become due under the Note or the Mortgage....*

5. The surplus, if any, after full payment of the above, shall be paid to the then Owner of record of the [Property].

Rent Assignment, at 3 (emphasis added). *See also* Rent Assignment, at 1 (the Debtor assigns to Lincoln "*all* the rents, issues and profits due or to become due") (emphasis added); and at 2 (the Rent Assignment is said to not have been intended to "create any liability on the part of [Lincoln] for ... failure to do any of the things which are authorized herein," or to create any "liabilities except as herein expressly set out").

The Mortgage contains similar provisions:

3.8 *Application of Rents and Other Income.* All earnings, revenues, issues, profits, income and rents collected by *Mortgagor* shall be applied in the following manner:

First, to the payment of all taxes, insurance premiums, prior charges and lien assessments levied against the [Property] or any part thereof;

Second, to the payment of ground rents, if any ...;

Third, (i) to the payment of reasonable compensation for Mortgagee's legal services, Mortgagee's agents, clerks, servants and other employees engaged or employed in respect to the [Property] and (ii) any amounts due and owing to Mortgagee under the terms of the Note and any other note and/or obligation secured hereby;

Fourth, to the payment of current operating costs and expenses (including repairs, maintenance, renewals, replacements, alterations, security, improvements

and necessary acquisitions of property) and expenditures for capital improvements arising in connection with the Premises;

Fifth, the remainder, if any, to Mortgagor or its designee.

3.9 *Priority of Application.* All rents collected by *Mortgagee* may be applied to the terms [sic] in Section 3.8, above listed *in any manner that Mortgagee deems advisable and without regard to the aforestated priorities.*

Mortgage, at 16–17 (emphasis added).

The terms of the Rent Assignment and Mortgage, and Lincoln's rights thereunder, could not be clearer. There is no question that, once Lincoln became entitled to the Rents, it became entitled to all of them, with no obligation to apply any part of the rental income to the upkeep and operation of the Property or to any other specific purposes. The fact that Lincoln could have applied the Rents in such a manner, in its sole discretion, does not mean that it was obliged to do so.

The Debtor's attempt to interpret the above quoted language in a manner which supports its Net Rent theory is unconvincing. However, the Debtor finds some support for its net rent theory in the following excerpts from the "Remedies" section of the Mortgage:

4.2. *Remedies.* [I]f any event of Default shall have occurred and/or be continuing, Mortgagee, at its option, shall have ... each and all of the following rights and remedies ...:

. . . . .

(b) *Management.* Mortgagee may, ... enter upon and take possession of ... the [Property], excluding the Mortgagor ... therefrom; Mortgagor shall on demand peaceably surrender possession thereof to Mortgagee. Upon every such entry, the Mortgagee ..., at the expense of the Mortgagor, from time to time, may maintain and restore the [Property] ...; and likewise, from time to time, at the expense of the Mortgagor, the Mortgagee may make all necessary or proper repairs, renewals and replacements and such useful alterations, additions, betterments and improvements thereto and thereon as to it

may seem advisable or necessary to preserve the value, marketability or rentability of the [Property]; and in every such case the Mortgagee shall have the right to manage, control and operate the [Property] and may make, cancel, modify or enforce leases, obtain and evict tenants, rent and lease the same to such persons, for such periods of time, and on such terms and conditions as Mortgagee in its sole discretion may determine, *and with or without taking possession of the [Property], may sue for or otherwise collect any and all of the rents, issues and profits thereof, including those past due and unpaid and apply same, **less costs and expenses of management, operation and collection, including attorneys fees,** upon any indebtedness secured hereby, all in such order as Mortgagee may determine.* In dealing with the [Property] as a Mortgagee in, or not in, possession, Mortgagee shall be without any liability, charge, or obligation therefor to Mortgagor other than for willful misconduct. . . .

Mortgage, at 21–22 (emphasis added). The Debtor interprets the highlighted language in the above block quote as standing for the proposition that Lincoln is only entitled to those Rents remaining after the payment of the "costs and expenses of management, operation and collection."

■ We conclude that such an interpretation cannot be reconciled with other provisions of the Rent Assignment and Mortgage. Rather, we think the above-quoted language merely addresses what would transpire in the contingency that Lincoln decides, in its discretion, to take possession and operate the Property. In that contingency, it permits Lincoln to fund or recoup the costs of operating the Property from the Rents, and then apply the remainder to the outstanding debt secured by the Rent Assignment and Mortgage. This interpretation is consistent with the other quoted sections of the Rent Assignment and Mortgage. And it is a general rule of contract interpretation that, where writings are executed at the same time and intertwined by the same subject matter, they should be construed and interpreted as a whole and, where possible, in harmony. *See, e.g., Kroblin Refrigerated Xpress, Inc. v. Pitterich,* 805 F.2d 96, 107–08 (3rd Cir.1986); *In re Valley Forge Plaza Associates,* 113 B.R. 892, 900 (Bankr.E.D.Pa.), *aff'd in part and rev'd in part sub nom. Valley Forge Plaza Associates v. Rosen Agency, Inc.,* 120 B.R. 789 (E.D.Pa.1990); and *Robinson v. Stover,* 320 Pa. 308, 315, 182 A. 145, 148 (1936).[4] This interpretation would allow Lincoln to continue operating the Property if it decided that maintaining the Property as a going concern represented its best repayment strategy. If, however, in the alternative, Lincoln decided to "cut its losses" and liquidate, we find that the foregoing contractual provisions, taken together, would allow Lincoln to collect the Rents without expending funds to maintain the Property while it foreclosed upon the Property and brought it to a Sheriff's sale.[5]

The Debtor also cites to several Pennsylvania cases in support of its net rent theory.

---

**4.** This interpretation is internally consistent within section 4.2(b) of the Mortgage as well. That section provides that the expenses which may be subtracted, first, from the gross Rents include "attorneys fees" [sic]. The immediately preceding clause refers to *Lincoln's* right to "sue for . . . the rents, issues and profits. . . ." It follows that the reference to attorneys' fees means Lincoln's attorneys' fees incurred in such a suit. This is further support for our interpretation that the listed expenses refer to the expenses Lincoln may incur if it takes possession of the Property or bring a law suit in order to collect the Rents.

**5.** Of course, such a plan of action could carry with it its own repercussions, such as loss of property value due to deterioration, loss of rental income from disgruntled tenants, or liability as a mortgagee in possession for causing defective or dangerous conditions. It is not likely that a prudent mortgagee would neglect the mortgaged property (especially with paying tenants) in the hope of saving a few dollars prior to foreclosure. It is, however, conceivable that a mortgagee would take this "hard line" position in an attempt to coerce its mortgagor to surrender the mortgaged property to it. Such draconian tactics are, for better or worse, a reality of the business world. In this instance, Lincoln has certainly bargained for this leverage and, in light of its properly recorded Rent Assignment and its pre-petition demand on the tenants, may now wield it over the Debtor notwithstanding the Debtor's bankruptcy filing. *See Mountain View, supra,* 5 F.3d at 38–39; and *Union Meeting I,* 160 B.R. at 765–67.

*See Randal v. Jersey Mortgage Investment Co.,* 306 Pa. 1, 158 A. 865 (1932); *Hostetter v. Giffen,* 268 Pa. 530, 112 A. 150 (1920); *Arthur W. Binns, Inc. v. Winthrop,* 158 Pa.Super. 254, 44 A.2d 532 (1945); *Peoples–Pittsburgh Trust Co. v. Henshaw,* 141 Pa.Super. 585, 15 A.2d 711 (1940); and *Miners Savings Bank of Pittston v. Thomas,* 140 Pa.Super. 5, 12 A.2d 810 (1940). *See also Provident Trust Co. of Philadelphia v. Judicial Building & Loan Ass'n,* 112 Pa.Super. 352, 171 A. 287 (1934); *Integrity Trust Co. v. St. Rita Building & Loan Ass'n,* 112 Pa.Super. 343, 171 A. 283 (1934), *aff'd,* 317 Pa. 518, 177 A. 5 (1935); and *Mathewson v. Klein,* 78 Pa. D. & C. 481 (Luzerne Co. C.P. 1951).

As noted above, it is not clear whether the Debtor asserts that the reasoning appearing in these cases provides an independent legal basis for its net rent theory. These cases do, in fact, refer to a mortgagee's entitlement to (or duty to apply) "net rents" from the mortgaged property. A closer analysis of these cases, however, reveals that they are not inconsistent with our conclusions.

■ A majority of these cases address the common law governing a mortgagee in possession whose actions are not otherwise dictated by the terms of its contract with the mortgagor. *See, e.g., Binns, supra,* 158 Pa.Super. at 258–59, 44 A.2d at 535; *Henshaw, supra,* 141 Pa.Super. at 590–92, 15 A.2d at 715; *Miners Savings Bank, supra,* 140 Pa.Super. at 10–12, 12 A.2d at 813; and *Provident Trust, supra,* 112 Pa.Super. at

354–57, 171 A. at 288–89. It is well established that a mortgagee who takes possession of the mortgaged property does not thereby succeed to the title of the rents or the property. *See Myers–Macomber v. M.L.W. Construction Corp.,* 271 Pa.Super. 484, 489, 414 A.2d 357, 360 (1979). "Rather, he becomes a quasi trustee, managing the property for the benefit of the mortgagor, but at the same time protecting his own interest." *Id.* Thus, a mortgagee in possession is held to a "prudent owner" standard, and "must manage the property in a reasonable and careful manner so as to keep it in a good state of preservation and productivity." *Id.*[6] This means, *inter alia,* maintaining and repairing the property on an on-going basis.

■ Although not always expressly stated therein, we believe the Pennsylvania cases cited above stand only for the proposition that a mortgagee in possession is entitled to a credit against the rents collected for all reasonable sums expended by it in furtherance of its duty to maintain the property. *See, e.g., Stern v. Sanet,* 169 Pa.Super. 448, 451, 82 A.2d 511, 513 (1951) ("In regard to allowance for repairs, ... 'the mortgagee is to be allowed the expense of necessary repairs' "), quoting *Harper's Appeal,* 64 Pa. 315, 321 (1870); and *Provident Trust, supra,* 112 Pa.Super. at 256, 171 A. at 289 ("[The mortgagee] is entitled to credit for necessary repairs and expenses incurred in the management of the property and the taxes paid by him.").[7] This proposition is not necessari-

---

6. The prudent owner standard is employed in order to protect the mortgagor's equity or remainder interest. This consideration is particularly relevant when the mortgagee intends to liquidate its debt through the on-going operations of the property, at which point it would be obligated to return the property to the mortgagor. *Myers–Macomber, supra,* 271 Pa.Super. at 489, 414 A.2d at 359–60 ("If the mortgagor should avoid foreclosure by paying off the mortgage debt while the mortgagee is in control of the property, ... the mortgagee must surrender possession to the mortgagor, for the mortgagor has retained his title to the real estate throughout the mortgagee's occupancy."). When there is no equity in the property, the underlying debt is nonrecourse, and the mortgagee intends to collect rents only until it can obtain title to and sell the property, as is the case with Lincoln, then the policy concerns giving rise to the prudent owner standard are not implicated. *But see In re 499*

*W. Warren Street Associates, Ltd. P.,* 142 B.R. 53, 57 (Bankr.N.D.N.Y.1992) ("The ... use of project rents [by the debtor/property owner] is not proscribed where the debtor's sole asset is the collateral, and the creditor is undersecured.").

7. *See also* 24 P.L.E. 559, 562–63, 570 (1960) ("If the mortgagee was in possession or collecting rents, he may take credit for his payment [of the property taxes] in accounting for the profits.... A mortgagee in possession ... has a duty to make the repairs reasonably necessary to keep the mortgaged property in good condition and to prevent its deterioration, and he is entitled to credit for reasonable sums expended.... The mortgagee is entitled to credit for proper expenditures on behalf of the property...."); 7 SUMMARY OF PA.JURIS.2d 386–87 (1992) (a mortgagee in possession is entitled to reimbursement for all sums expended on necessary repairs); and 59 C.J.S. 397, 455–56 (1949) (a mortgagee in

ly self-evident in light of the fact that a mortgagee in possession is not, in every instance, entitled to recoup its costs of preserving or improving the mortgaged property. *See, e.g., Harper's Appeal, supra,* 64 Pa. at 321 (a mortgagee in possession is not entitled to a credit for costly additions and improvements which have not been approved by the mortgagor); *Winthrop v. Arthur W. Binns, Inc.,* 160 Pa.Super. 214, 218, 50 A.2d 718, 720 (1947) ("[A] mortgage [sic] in possession is not entitled to compensation for his own services in connection with management of the mortgaged property and collection of the rentals unless equitable considerations require otherwise."); and 59 C.J.S., *supra,* at 397 (same).

Lincoln argues that, because it is not in possession of the Property, and never will be if the Debtor's Plan is confirmed, it has no common law duty to utilize part of its Rents for the preservation of the Property. Although certain of the cases cited by the Debtor seem to impose this duty on a mortgagee even when it only has constructive possession of the mortgaged property, *see, e.g., Randal, supra,* 306 Pa. at 4–6, 158 A. at 865–66; and *Henshaw, supra,* 141 Pa.Super. at 587, 591, 15 A.2d at 713, 715, there is also support for Lincoln's contention. *See Zisman v. City of Duquesne,* 143 Pa.Super. 263, 265–66, 18 A.2d 95, 97 (1941) ("The term 'mortgagee in possession' is applied to one who has lawfully acquired actual possession of the premises mortgaged to him, ... but the mere fact that the mortgagee receives the rents and profits does not constitute him a mortgagee in possession, unless he takes the rent in such a way as to take out of the hands of the mortgagor the management and control of the estate."). *See also* 24 P.L.E., *supra,* at 555 ("The mere fact that [the mortgagee] receives rents and profits does not make him a mortgagee in possession...."); and 59 C.J.S. *supra,* at 392–93. *Cf. Fidelity*

*Title & Trust Co. v. Garrett,* 327 Pa. 305, 310, 194 A. 398, 400 (1937).

■ We need not resolve this issue, however, because we are bound by the decision in *Mountain View* which holds that a mortgagee which has properly recorded its assignment of rents and has made appropriate demand upon the tenants for payment of rents to it pre-petition holds title to the rents which the debtor may not use to fund a plan of reorganization.[8] Although we face some difficulty reconciling the early Pennsylvania cases with the Third Circuit's holding in *Mountain View,* in doing so we are, to an extent, attempting to force a square peg into a round hole. Just as the turn-of-the-century Pennsylvania courts were not familiar with the notion of a "perfected" interest in rents, *Mountain View,* 5 F.3d at 39, so too were they unfamiliar with the rent ownership question as it impacts upon 11 U.S.C. § 541 of the Bankruptcy Code. *But see Henshaw, supra,* 141 Pa.Super. at 592–93, 15 A.2d at 716 ("If the mortgagor goes into bankruptcy ..., and the rent, in consequence, comes into the custody or control of the law, the priority of the mortgagee will be recognized and the rents distributed to the mortgagee in preference to the general creditors ..., at least where the mortgage conveys the rents, issues and profits accruing under subsequent leases and the mortgagee gives notice of his demand for their payment.") (citations and footnote omitted). Thus, we must do our best to adhere to the spirit of the state law as we apply it within the construct of the Bankruptcy Code. Finally, we must adhere to decisions of the Court of Appeals, such as *Mountain View,* whenever we engage in this exercise.

■ In further support of our conclusion, we note that, even if a mortgagee in constructive possession of the mortgaged prop-

---

possession is entitled to reimbursement for all amounts expended which were necessary for the management and protection of the property and is entitled to reimbursement for all sums expended which were necessary to keep the property in good repair).

8. Of course, the actions taken by mortgagees in the early 1900's which placed upon them the prudent owner standard of care for the benefit of

the mortgagor's remainder is no different than what is necessary today to secure a mortgagee's absolute ownership in the rents, at least according to *Mountain View.* The notion of absolute ownership of the rents, however, is inconsistent with a mortgagee in possession's fiduciary duty to its mortgagor once in possession of the property and collecting rents.

erty is required to use the rents to maintain the property, that duty, which runs only to the mortgagor, *see Myers–Macomber, supra,* 271 Pa.Super. at 490, 414 A.2d at 360, may be expanded, lessened or eliminated altogether by the parties' contracts. *See* 59 C.J.S., *supra,* at 394, 427–28 ("The rights and duties of a mortgagee in possession, *in the absence of contractual provisions,* are fixed by law, that is, by equitable precedents and principles.... If the mortgagee has lawfully obtained possession of the estate, without foreclosure or before foreclosure, it is his right and duty to collect the rents and profits ... and he is bound to apply them on the mortgage debt and to account for the surplus, *unless by agreement of the parties the rents and profits are to be otherwise applied.*") (footnotes omitted) (emphasis added). *Cf. Hostetter, supra,* 268 Pa. at 532–34, 112 A. at 150–51; *Integrity Trust, supra,* 112 Pa.Super. at 350, 171 A. at 286; and *Mathewson, supra,* 78 Pa. D. & C. at 485–87. *See also Randal, supra,* 306 Pa. at 6, 158 A. at 866 ("Whenever, by the terms of a mortgage, the rents of the property are expressly conveyed to the mortgagee, the latter ... may, if the owner is in default, enforce that provision according to its terms.").

For example, in the *Hostetter* case, the property owner and its second mortgagee entered into a contract under which all leases of the mortgaged property were assigned to the second mortgagee, who was thereby authorized to manage the property, make leases, collect rents, and pay current expenses. 268 Pa. at 532–33, 112 A. at 150–51. For his services, the second mortgagee was entitled to a fee equal to a percentage of the monthly rents, as well as interest payments on its second mortgage, but only after payment of current expenses, taxes, and debt service on the first mortgage. 268 Pa. at 532, 112 A. at 151. After a time, the income stream from the property proved insufficient to meet the demands placed upon it, and the second mortgagee began to apply the rents collected to its own mortgage without regard to the other expenses. 268 Pa. at 533, 112 A. at 151. When the first mortgagee obtained a judgment against the mortgagor and named the second mortgagee as garnishee, the second mortgagee responded by noting that it

was a mortgagee in possession with the right to apply the rents to its debt. *Id.* The court did not agree:

> By his acceptance of and acting under the contract [the second mortgagee] became bound by it. Considering all its provisions, he was agent for the owners of the building and received rents as such. His agency also included the distribution of the funds, no part of which vested in him individually, until all current expenses were paid....

> . . . . .

> What appellant urges as the power of a mortgagee in possession to apply the income on his incumbrance may be sound in cases where there is no agreement to the contrary; but here the rights of the parties grow out of their contract.

268 Pa. at 533–34, 112 A. at 151. Unlike the mortgagee's contracts in the *Hostetter* case, the instant Rent Assignment and the Mortgage grant Lincoln rights in the Rents which are much broader than its common law rights. The end result is the same, however. The parties' contracts control.

Finally, the Debtor cites to a number of bankruptcy cases interpreting the laws of jurisdictions other than Pennsylvania in support of its net rent theory. *See In re Monarch Development Co.,* 153 B.R. 829 (Bankr. S.D.Ill.1993); *499 W. Warren, supra; In re Rollingwood Apartments, Ltd.,* 133 B.R. 906 (Bankr.S.D.Ohio); *In re Landing Associates, Ltd.,* 122 B.R. 288 (Bankr.W.D.Tex.1990); *In re Cardinal Industries, Inc.,* 118 B.R. 971 (Bankr.S.D.Ohio 1990), *rev'd sub nom. In re Thymewood Apartments, Ltd.,* 123 B.R. 969 (S.D.Ohio 1991); *In re Raleigh/Spring Forest Apartments Associates,* 118 B.R. 42 (Bankr. E.D.N.C.1990); *In re Willowood East Apartments, Ltd.,* 114 B.R. 138 (Bankr.S.D.Ohio 1990); and *In re Parham,* 72 B.R. 604 (Bankr.M.D.Fla.1987).

These cases are easily distinguished. Most of them involve disputes between a creditors asserting security interests in rents, and debtors who desire to use the rents during the pendencies of their respective bankruptcy cases. Typically, although not exclusively, these disputes arise in the

context of hearings on the use of cash collateral or creditors' motions for determinations of secured claims. *See 499 W. Warren, supra*, 142 B.R. at 54; *Rollingwood, supra*, 133 B.R. at 907; *Landing Associates, supra*, 122 B.R. at 290; *Cardinal Industries, supra*, 118 B.R. at 973; *Willowood, supra*, 114 B.R. at 139; and *Parham, supra*, 72 B.R. at 604. These courts permitted the respective debtors to use the rents to pay for the necessary expenses of operating their properties because (1) the parties' contract provides for such expenditures, *Cardinal Industries, supra*, 118 B.R. at 981; and *Willowood, supra*, 114 B.R. at 143–44; (2) such expenditures provide adequate protection for the mortgagees, *499 W. Warren, supra*, 142 B.R. at 57–58; *Rollingwood, supra*, 133 B.R. at 913; *Cardinal Industries, supra*, 118 B.R. at 981; *Raleigh/Spring Forest, supra*, 118 B.R. at 46; or (3) they found that equity so required. *499 W. Warren, supra*, 142 B.R. at 57–58; *Cardinal Industries, supra*, 118 B.R. at 981; and *Willowood, supra*, 114 B.R. at 143–44.[9]

We need not pass on the theses of these cases. None of them deal with the situation where a debtor seeks to use rents which are the property of its mortgagee in a plan of reorganization. There is a world of difference between a security interest in rents and an absolute ownership interest in rents. Indeed, in a decision reversing in part and remanding the *Cardinal Industries* case cited by the Debtor, the District Court noted that, pursuant to the relevant state law, the mortgagee had secured, pre-petition, an absolute ownership interest in the Debtor's rents. *Thymewood Apartments, supra*, 123 B.R. at 977–79. The District Court then remanded the case back to the Bankruptcy Court so that it could determine the effect of the District Court's conclusion on the Bankruptcy Court's prior determination that the rents were part of the debtor's estate. *Id.* at

979. On remand, the Bankruptcy Court concluded that the rents were still part of the Debtor's estate, but only after holding that the state law, as interpreted by the District Court, did not apply retroactively to the parties' agreement. *In re Thymewood Apartments, Ltd.*, 129 B.R. 505 (Bankr.S.D.Ohio 1991).

The Debtor is not so fortunate. The state law, as conclusively interpreted by *Mountain View*, and the Rent Assignment and Mortgage, as interpreted by us, collaborate against it. We therefore conclude that the Net Rents, as well as the gross Rents, are the property of Lincoln. As such, the Debtor's Plan, which seeks to utilize any portion of the Rents without Lincoln's consent, is not feasible and cannot be confirmed pursuant to 11 U.S.C. § 1129(a)(11). *See Union Meeting I*, 160 B.R. at 765–67.

b. THE DEBTOR'S PLAN ALSO COULD PROBABLY NOT BE CONFIRMED BECAUSE IT MAY NOT MEET THE REQUIREMENTS OF SECTIONS 1123(a)(4), 1129(a)(10), 1129(b)(1), OR 1129(b)(2)(B).

i. *11 U.S.C. § 1123(a)(4)*

Lincoln also objects to § 3.6(e) of the Debtor's Plan, which allows all unsecured creditors except Lincoln to receive an additional fifteen (15%) percent dividend directly from the General Partners if they vote in favor of the Debtor's Plan and releases the General Partners of all liability. For Lincoln to receive the same fifteen (15%) percent dividend, it must (1) vote in favor of the Debtor's Plan; (2) elect treatment of its secured claim under the Debtor's Plan alternative "A" which requires Lincoln to relinquish its entitlement to the Rents; (3) forego its § 1111(b) election; and (4) release the General Partners from all liability to it. Not surprisingly, Lincoln argues that this dispa-

---

9. We disagree with the *Willowood* court to the extent that it holds that it is equitable to allow a debtor to use a mortgagee's rents to pay operating expenses because "[the mortgagee's] nonrecourse loan was extended to an entity whose only asset is income producing real property ... [and therefore the mortgagee] must have known that some portion of the gross rents would be required to keep the Property operating." 114 B.R. at 143. While this may be true, the mort-

gagee is also aware that the income from the real property might prove insufficient to retire the loan, and, therefore, has likely provided for a liquidation contingency as well. Moreover, the mortgagee may bargain for exclusive control of the rents simply to gain leverage on its mortgagor. *See* page 564 n. 8, *supra*. As long as this bargaining is between competent parties, aboveboard and at arms length, equity plays no part in the interpretation of the parties' contract.

rate treatment of different creditors in the same class violates 11 U.S.C. § 1123(a)(4) which requires "a plan [to] ... provide the same treatment for each claim ... of a particular class, unless the holder of a particular claim ... agrees to a less favorable treatment to such particular claim...."

As a preliminary matter, we must determine which class of claims established in the Debtor's Plan contains Lincoln's unsecured deficiency claim. Lincoln assumes that its deficiency claim is included in Class 6, which contain the other claims of general unsecured creditors. This assumption is not unreasonable. The Debtor's Plan, which refers to Lincoln's deficiency claim in the Class 1 treatment section, states, at § 3.1(d)(iii)(b), that "[t]he Allowed Unsecured Claim of Lincoln shall be treated in the same manner as a Class 6 General Unsecured Claim." Furthermore, the section of the Plan addressing treatment of Class 6 claims specifically refers to Lincoln's deficiency claim, at § 3.6(e)(2). Finally, the Debtor's Report of Plan Voting recognizes and tallies Lincoln's Class 6 ballot rejecting the Plan. On the other hand, the Debtor's Plan, at § 2.1(a), defines Class 1 as including the allowed "claims" of Lincoln, not merely the allowed *secured* claim of Lincoln. Also, the Class 1 description section of Debtor's Plan states: "No Claims or Interests of Lincoln shall be included in or treated as part of any other class of Claims or Interests." *Id.*

It appears to us that the Debtor may be attempting to insulate the class of unsecured creditors from Lincoln's deficiency claim, which would otherwise dominate the class, by placing Lincoln's deficiency claim along with Lincoln's allowed secured claim in Class 1. If this were the Debtor's intention, it appears that such a classification scheme may violate 11 U.S.C. § 1122(a), which permits only substantially similar claims to be classified together. *See In re Coventry Commons Asso-*

ciates, 155 B.R. 446, 450–51 (E.D.Mich.1993); and *In re 266 Washington Associates,* 141 B.R. 275, 285 (Bankr.E.D.N.Y.), *aff'd,* 147 B.R. 827 (E.D.N.Y.1992). *But see In re Ofra Corp. of Philadelphia,* 129 B.R. 404, 416–17 (Bankr.E.D.Pa.1991). Despite the Plan's ambiguity on this point, the Debtor's Voting Report seems to suggest that the Debtor now considers Lincoln's deficiency claim to be part of Class 6. We will therefore assume that this claim is in fact included in Class 6.

Because Lincoln's claim is nonrecourse and because the General Partners have not guaranteed this debt, the Debtor might have been allowed to treat Lincoln's deficiency claim in the manner described if it had placed Lincoln's unsecured claim in its own class, apart from the claims of the general unsecured creditors and Lincoln's secured claim. *See, e.g., In re 222 Liberty Associates,* 108 B.R. 971, 989–93 (Bankr.E.D.Pa.1990).[10] However, the Debtor, for better or for worse, has chosen to incorporate both types of claims in the same class in its current Plan before us, and to treat them differently. The clear dictates of § 1123(a)(4) require us to deny confirmation of the Debtor's Plan for that reason. *See In re AOV Industries, Inc.,* 792 F.2d 1140, 1151–52 (D.C.Cir.1986) ("It is disparate treatment when members of a common class are required to tender more valuable consideration—be it their claim against specific property of the debtor or some other cognizable chose in action—in exchange for the same percentage recovery.").

ii. *11 U.S.C. § 1129(a)(10), and 1129(b)(1)*

Lincoln next asserts that Debtor's Plan cannot be confirmed because no class of claims which may be considered an impaired class for the purposes of 11 U.S.C. §§ 1129(a)(10) has accepted the Debtor's Plan. According to Debtor's Voting Report, three impaired classes have voted to accept its Plan. These classes consist of Class 2

---

10. Lincoln would likely have objected to such a classification scheme and Debtor would have had to prove that the separate classification was reasonable. *See In re Swedeland Development Group, Inc.,* 16 F.3d 552, 567–68 (3rd Cir.1994) (en banc); *John Hancock Mutual Life Ins. Co. v. Route 37 Business Park Associates,* 987 F.2d 154, 157–61 (3rd Cir.1993); and *In re Jersey City Medical Center,* 817 F.2d 1055, 1061 (3rd Cir.

1987). Thus, we do not intend to suggest that such a classification scheme necessarily would have survived challenge, or that the acceptance of the Debtor's Plan by the separately classified and impaired general unsecured creditors' class necessarily would have satisfied 11 U.S.C. § 1129(a)(10) if this maneuver had been implemented. *See* pages 567–68 *infra.*

(Hansen's claim), Class 3 (property tax claims) and Class 7 (General Partners' interests). For the reasons expressed below, we join Lincoln in questioning whether the acceptances by these classes fulfill the requirements of § 1129(a)(10), and, therefore, of § 1129(b)(1).

■ First, as we noted in *Union Meeting I,* 160 B.R. at 773, the claim of Hansen, the Debtor's second mortgagee, may have had to have been included in the same class as the general unsecured creditors if the Hansen's claim is totally unsecured. Nothing has developed in this case since our opinion in *Union Meeting I* which would cause us to alter our prior conclusion that Hansen's claim is, indeed, completely "under water." *Id.* The Debtor's Plan acknowledges as much, at § 3.2(b) ("Hansen's Allowed Claim shall be treated in the same manner as a Class 6 General Unsecured Claim."). Thus, if Debtor is to separately classify Hansen's unsecured deficiency claim, the separate classification must advance a reasonable scheme for determining the preferences of the creditors and weighing those sometimes contradictory preferences vis-a-vis each other. In other words, Debtor must explain why Hansen "represent[s] a voting interest that is sufficiently distinct and weighty to merit a separate voice in the decision whether the proposed reorganization should proceed." *John Hancock, supra,* 987 F.2d at 159.

The only reason proffered by Debtor for separately classifying Hansen's deficiency claim is that Hansen's "rights are dissimilar to all other creditors." Memorandum of Law of Union Meeting Partners (A) in Support of Debtor's Third Amended Plan of Reorganization and (B) in Opposition to Lincoln National Life Insurance Co.'s Second Amended Plan of Reorganization ("the Debtor's Brief"), at 25. The Debtor does not further describe how Hansen's rights differ from those of the other unsecured creditors or why such differences, if they exists at all, warrant an independent voice in the voting process. *See Swedeland Development, supra,* 16 F.3d at 567–68; and *John Hancock, supra,* 987 F.2d at 162. The Debtor points out that "[a]bsent [the Debtor's] Bankruptcy, Hansen has the right to foreclose, a right not available to unsecured creditors." The Debtor's Brief, at 25. This sort of reasoning, standing alone, was found insufficient, in *John Hancock, supra,* 987 F.2d at 161, to justify separate classification. *See also In re Thornwood Associates,* 162 B.R. 438, 441 (M.D.Pa.1993); and *In re Fairfield Executive Associates,* 161 B.R. 595, 601–05 (D.N.J. 1993). *But see In re SM 104, Ltd.,* 160 B.R. 202, 214–21 (Bankr.S.D.Fla.1993); and *In re D & W Realty Corp.,* 156 B.R. 140, 142–45 (Bankr.S.D.N.Y.1993) (it is not only appropriate, but necessary, to classify undersecured creditors' deficiency claims separate from general unsecured claims).

It appears that the Debtor has not sufficiently articulated the reason why the Debtor did not simply include Hansen's deficiency claim in the class of general unsecured creditors, as we hold Lincoln properly did in *Union Meeting I,* 160 B.R. at 773. This is especially true because Hansen is treated exactly like the general unsecured creditors. The provisions of the Debtor's Plan addressing the treatment of Hansen's claim specifically incorporates the provision regarding the treatment of the general unsecured creditors in Class 6. It is particularly ironic to note that Hansen is treated the same as all members of Class 6, but classified separately, while Lincoln's claim is included in Class 6, but is treated differently. *See* pages 567–68 *supra.* It therefore appears that the Debtor was obliged to make a stronger argument than it has for separately classifying Hansen's deficiency claim if it hoped to avoid the criticism that its classification of Hansen was motivated by its desire to circumvent § 1129(a)(10), especially in light of our conclusion that the votes of no other classes satisfy § 1129(a)(10). *See* pages 568–69 *infra.*

■ Next, we must determine whether the acceptance of the Plan by the impaired class of property tax claim holders can satisfy the requirements of § 1129(a)(10). A majority of the courts which have addressed this issue have held that a class of unsecured priority tax claims may not serve as an impaired accepting class as contemplated by § 1129(a)(10). *See, e.g., In re Bryson Properties, XVIII,* 961 F.2d 496, 501 n. 8 (4th

Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 191, 121 L.Ed.2d 134 (1992) ("[P]riority tax claimants, which receive preferential treatment under the Code ..., are not an impaired class that can accept a plan and bind other truly impaired creditors to cram down."); and *In re Perdido Motel Group, Inc.,* 101 B.R. 289, 292–94 (Bankr.N.D.Ala. 1989) ("If [§ 1129](a)(10) is to have any real role of offering some protection to holders of impaired claims in chapter 11 cases, the acceptance of a plan by holders of highly-favored tax claims does not constitute acceptance by a 'class' of impaired claims."). The Debtor calls our attention to two cases which discuss scenarios in which the analyses of the foregoing cases may not apply, *In re Venture Capital L.P.,* No. 91–13035, slip op. at 13–14 & n. 6 (Bankr.E.D.Pa. Feb. 16, 1993) (Fox, J.); and *In re General Development Corp.,* 135 B.R. 1008, 1011 n. 3 (Bankr.S.D.Fla. 1991). These cases suggest that a property tax which has become a secured claim prepetition falls outside of the scope of 11 U.S.C. § 507(a)(7), which requires priority treatment of pre-petition unsecured tax claims, and, therefore, may be impaired under a plan. As such, the argument goes, the holders of these claims may vote to accept the plan and satisfy the § 1129(a)(10) requirement. *Compare* 11 U.S.C. § 1129(a)(10) *with* 11 U.S.C. § 1129(a)(9).

We need not address this issue. The Debtor has offered no evidence that the claims contained in Class 3 of the Plan are secured by liens. Furthermore, unlike the treatment of the tax claims in the *General Development* case, 135 B.R. at 1011, the Debtor proposes to repay its property taxes consistently with § 1129(a)(9)(C), thus suggesting that the property taxes are § 507(a)(7) unsecured priority claims. We therefore conclude that the accepting vote of the class of property tax claimants cannot serve as the impaired accepting class required by § 1129(a)(10).

 Finally, Lincoln asserts that the acceptance by Class 7, consisting of the Debtor's General Partners, cannot serve as the needed impaired accepting class. It points out that § 1129(a)(10) provides that the impaired accepting class required by

§ 1129(a)(10) must be "determined without including any acceptance of the plan by any insider." *See In re Ingleside Associates,* 136 B.R. 955, 960–62 (Bankr.E.D.Pa.1992). The Debtor offers no response to this objection, and we believe that acceptance by Class 7, without acceptance by any other impaired accepting class, cannot supply the prerequisites of § 1129(a)(10). We therefore conclude that it is questionable whether any of the impaired classes which have voted in favor of Debtor's Plan are eligible to serve as the impaired accepting class required by § 1129(a)(10), and, therefore, the Debtor's Plan could possibly be denied confirmation on this ground as well.

### iii. *11 U.S.C. § 1129(b)(2)(B)*

Lincoln's final objection to the Debtor's Plan which appears to have merit is its assertion that the Debtor's Plan is not "fair and equitable" because it violates the absolute priority rule. Pursuant to 11 U.S.C. § 1129(b)(2)(B), a plan is fair and equitable to a class of unsecured claimholders who vote to reject a plan when either the plan pays in full the allowed amount of such claims, or when no claim or interest junior to the unsecured creditors will receive or retain anything under the plan. Because Class 6, courtesy of Lincoln's vote, rejected the Debtor's Plan, and the unsecured creditors are not receiving full payment of their claims; and because the General Partners are permitted to retain their interests in the reorganized Debtor, Lincoln claims that the Debtor's Plan violates the absolute priority rule. In response, the Debtor argues that the General Partners are only allowed to retain their equity interests if they make certain capital infusions, and that these capital infusions constitute significant new value to the Debtor. According to the Debtor's Plan, at § 3.7(d), if the General Partners wish to maintain their equity interests in the reorganized Debtor, they must contribute a total of $200,000 on the effective date, and an additional $412,928 "in installments ... as required to fund the payments required to all classes under the Plan except Class 1 [Lincoln]."

We have recently reaffirmed our earlier conclusion that the new value exception to the absolute priority rule has continuing vitality under the Bankruptcy Code. *In re Wynnefield Manor Associates*, 163 B.R. 53, 55–56 (Bankr.E.D.Pa.1993). *See also 222 Liberty Associates*, 108 B.R. at 983–85. However, as we have also stated there and several times before, in order to successfully invoke the new value exception, a debtor must show that the new value is "(1) necessary to the reorganization; (2) in the form of money or money's worth; ... (3) reasonably equivalent to the interest retained," *In re Capital Center Equities*, 144 B.R. 262, 268 (Bankr.E.D.Pa.1992), quoting *In re Snyder*, 967 F.2d 1126, 1131 (7th Cir.1992), and (4) "substantial and proffered by the Debtor at the outset, *i.e.*, 'up front.'" *Wynnefield Manor, supra*, 163 B.R. at 56 quoting *In re Custer*, 1993 WL 7965, slip op. at *6 (Bankr. E.D.Pa. Jan. 7, 1993). Because we find that the Debtor has failed to carry its burden on the first and fourth prong of the new value test,[11] we conclude that the General Partners' proposed contribution of new value is not sufficient to satisfy the new value exception to the absolute priority rule.

The Debtor did not prove that the General Partners' new value is substantial, nor do we think it is. In the following analysis, we consider only the $200,000 contribution, because the agreement to contribute an additional $412,928 "as required" is nothing more than a promise to pay money in the future, and is therefore not money or money's worth paid "up front." *Snyder, supra*, F.2d at 1131; *Capital Center, supra*, 144 B.R. at 268; and *In re Stegall*, 85 B.R. 510, 514 (C.D.Ill. 1987), *aff'd*, 865 F.2d 140 (7th Cir.1989).

Even if we use the Debtor's claim figures, the $200,000 contribution represents a mere 5.9% of the unsecured claims,[12] 6.6% of the undersecured portion of Lincoln's claim, and 2.1% of Lincoln's entire claim. *See Wynnefield Manor, supra*, 163 B.R. at 56–57; and *Capital Center, supra*, 144 B.R. at 270.

Nor do we believe that the General Partners' new value contribution represents their best efforts. Although the General Partners are willing to contribute only $200,000 toward the reorganization and nothing toward operations (thus requiring the use of the Property's Net Rents for that purpose), they are presumably willing to spend as much as $504,947 in order to escape personal liability on the Debtor's various debts (*i.e.*, the total unsecured claims of $3,366,316 times the additional fifteen (15%) percent dividend to be paid directly by the General Partners in exchange for releases). This disparity is not indicative of "best efforts" on the part of the General Partners. *See Wynnefield Manor, supra*, 163 B.R. at 56–57; and *Capital Center, supra*, 144 B.R. at 269–70. Furthermore, it is to be recalled that the Debtor now argues, in opposition to Lincoln's Plan, that the General Partners have considerable assets, perhaps in excess of $27 million, which could be liquidated in part, and proceeds from same made available to the Recourse Creditors. *See* pages 573–76 *infra*. The contribution proposed is therefore not very generous in comparison with the General Partners' financial capabilities. *Compare Wynnefield Manor, supra*, 163 B.R. at 57.

Finally, we note that the Debtor never explains the necessity for the General Part-

---

**11.** Arguably, the new value offered by the Debtor's General Partners does not meet the third prong of the test either. Debtor argues that there is no equity in the Property and, therefore, any new value contribution will be at least equivalent to the interest retained by the General Partners. Although this may be true in certain instances, *see In re River Village Associates*, 1993 WL 243897, slip op. at *5 (Bankr.E.D.Pa. June 29, 1993), we have also observed that equity holders may have to pay for "upside potential," which could be quite valuable to them if it is realized and quite costly for the secured creditors if it never materializes. *See also Wynnefield Manor, supra*, 163 B.R. at 59–60. In this case, the Property is worth over $6 million, and, if the

real estate market recovers, it may some day be worth considerably more. Given the upside potential in this case, we doubt that $200,000 fairly allocates the risks and potential benefits between the General Partners and Lincoln.

**12.** We arrive at the unsecured claim total as follows:

| | |
|---|---|
| Lincoln's unsecured claim: | $2,972,281 * |
| Hansen's unsecured claim: | 316,820 * |
| Claims of general trade creditors: | 77,215 ** |
| **TOTAL** | **$3,366,316** |

\* figure taken from Debtor's Plan.
\*\* figure taken from Debtor's Schedules.

ners' $200,000 contribution, even after Lincoln raised this very question in its objections to the Plan. Based on Debtor's intended use of the gross Rents, it is clear that the new value will not be used to improve or maintain the property. *Compare Wynnefield Manor, supra,* 163 B.R. at 58–59; and *222 Liberty Associates, supra,* 108 B.R. at 985. Even if the initial contribution is to be used to fund plan payments,[13] *id.,* the Debtor's projections indicate that the sum needed to cover funding shortfalls over the life of the Plan will be considerably more. And, again, although the Debtor's Plan calls for additional future contributions from the General Partners, we can only test the sufficiency of that new value which will be contributed up front. Thus, on one hand, there is no proof that the $200,000 in new value is needed for specific, significant purposes, and, on the other hand, the proposed new value contribution is clearly insufficient to meet certain other purposes. *See generally* K. Kruis, *A Framework for Application of the New Value Exception,* 21 CAL.BANKR.J. 199, 207 (1993) (suggesting four factors to consider when gauging the necessity of new value contributions, including the need for the contribution, its proposed use, and its sufficiency).

In light of the above, we conclude that the Debtor's Plan does, indeed, appear to violate the absolute priority rule, as codified in § 1129(b)(2)(B). Therefore, the Debtor's Plan could probably not be crammed down over the objection of Lincoln for this reason, also.

## c. LINCOLN'S REMAINING OBJECTIONS TO THE DEBTOR'S PLAN ARE WITHOUT MERIT.

■ Among the remaining objections is Lincoln's contention that the Debtor's valuation of its secured and unsecured claim contained in its Plan is inaccurate. The figures included in the Plan do vary from those included in Lincoln's amended proof of claim. We note, however, that the Debtor has filed an objection to Lincoln's amended proof of claim. Furthermore, it is true of many claims in bankruptcy that their value will vary from one point in time to the next. 3 COLLIER ON BANKRUPTCY, ¶ 506.04, at 506–22 (15th ed. 1993) (due to market fluctuations, adequate protection payments, § 506 actions, etc., "the amount of any claim secured by collateral of a changeable value must be regarded as a 'moving target'"). As long as a debtor provides for full payment of any such claim, as allowed, in its plan, it need not have the claim liquidated until its value is fixed. *See, e.g., In re Weiss–Wolf, Inc.,* 59 B.R. 653, 655 (Bankr.S.D.N.Y.1986) (the debtor must provide for disputed claims in its plan, although it need not pay such claims until the disputes are resolved).

Most debtors avoid the inconvenience of, and need for, constant plan revisions by providing for whatever a claimant's "allowed claim" is rather than providing for a claim in a specified amount. Indeed, Class 1 of the Debtor's Plan consists of the "Allowed Claims of Lincoln National Life Insurance...." Debtor's Plan, at § 1.7 (definition of "Allowed Claim"); and at § 2.1(a) (classification and description of Class 1). Although the Debtor later inserts actual claim values, this statement requires, at most, a Plan revision, not a denial of confirmation.

■ Lincoln also objects to the Debtor's Plan on § 1129(a)(7) grounds, asserting that it will not receive as much on account of its claim at present value under the Debtor's Plan as it would in a Chapter 7 liquidation. *See* 11 U.S.C. § 1129(a)(7). Neither of the parties' discussions of this Code section are complete or helpful to us. Without explanation or analysis, Lincoln posits a dollar amount which it contends represents the value of the Debtor's assets if liquidated today. Lincoln's Memorandum of Law (i) In Support of Confirmation of Its Second Amended Plan of Reorganization and (ii) In Opposition to Confirmation of Debtor's Third Amended

---

**13.** There is no indication that the $200,000 is intended to fund Plan payments. It states merely that, in the event that the Debtor is unable to use the Rents to fund Plan payments, alternative "B" of the Debtor's Plan, at § 3.7(d), requires General Partners to contribute additional funds to cover total shortfalls over the life of the Plan. Furthermore, the first funding shortfall does not occur until the second Plan year, but there is no provision in the Plan for the investment of the $200,000 during the first Plan year or the application of the resulting interest.

Plan of Reorganization ("Lincoln's Brief"), at 26. As far as we can tell, Lincoln has not taken into account any of the costs and expenses of liquidation, making its liquidation figure suspect, to say the least. The Debtor, on the other hand, after acknowledging that Lincoln's payment stream under the Plan must be reduced to present value for the purposes of the § 1129(a)(7) test, *see* 11 U.S.C. § 1129(a)(7) '(requiring that claimants in an impaired class "receive or retain under the plan ... property of a value, *as of the effective date of the plan*," equal to the amount such claimants would receive if the debtor were liquidated) (emphasis added), *totals* Lincoln's payments over the life of the Plan, and then, without making a reduction of same to present value, compares that sum to its liquidation value figure of $5,074,800. Debtor's Brief, at 22.

To determine the present value of a stream of payments, the total payments for each year of the payment term must be multiplied by a discount factor in order to reduce the payments for that particular year to present value. Once this calculation is performed as to the total payments for each year of the payment term, the resulting products must be added together. The sum represents the present value of the entire payment stream. The discount factor is thus determined by the formula $1/(1 + i)^n$ where "i" equals the interest rate and "n" equals the applicable year in the payment term. W. BEYER, CRC STANDARD MATHEMATICAL TABLES 568 (25th ed. 1981). Pursuant to the Debtor's Plan, Lincoln will be paid in full over nine (9) years at nine and one-eighth (9⅛%) percent interest. Thus, Lincoln's "discount rate" of fourteen (14%) percent (which is nothing more than the interest rate it would like the Debtor to pay on its debt), Lincoln's Brief, at 26, is not appropriate. *See Union Meeting I*, 160 B.R. at 768 (the Debtor's proposed interest rate of nine and one-eighth (9⅛%) percent is approved by court). Thus, where "i" equals nine and one-eighth (9⅛%) percent and "n" equals 9, applying the above formula to Lincoln's payment stream proposed in Debtor's Plan yields a present value of $6,010,711.[14] This figure is substantially larger than the liquidation value contained in Debtor's liquidation analysis, which, unlike Lincoln's figure, accounts for the priority expenses of liquidation.[15] Because we find the Debtor's liquidation value more reliable than Lincoln's, and because the

**14.** Our calculation was derived as follows:

| Payment Year | Total Plan Payments/yr * | × Discount Factor | = Present Value of Yearly Payments ** |
|---|---|---|---|
| 1 | $ 700,558 *** | .91638 | $ 641,977 |
| 2 | 863,974 | .83975 | 725,522 |
| 3 | 918,500 | .76953 | 706,813 |
| 4 | 1,055,723 | .70518 | 744,475 |
| 5 | 1,109,785 | .64622 | 717,165 |
| 6 | 1,174,562 | .59218 | 695,552 |
| 7 | 1,234,046 | .54266 | 669,667 |
| 8 | 1,290,452 | .49728 | 641,716 |
| 9 | 1,026,606 | .45570 | 467,824 |
| **Present Value of Entire Payment Stream:** | | | **$6,010,711** |

\* All figures taken from Debtor's Plan, at Exhibit "B."

\*\* Rounded to nearest whole dollar.

\*\*\* Contrary to Debtor's assertions, the Debtor's Brief, at 22, it is not appropriate to include Plan payments on Lincoln's unsecured claim in year one. 11 U.S.C. § 1129(a)(7).

**15.** Even if we use the discount rate suggested by Lincoln, Lincoln's payments under Debtor's Plan, at present value, would equal $4,897,099. This is very nearly the amount Lincoln would receive in a liquidation according to the Debtor's liquidation analysis.

payments to be made on Lincoln's secured claim under the Debtor's Plan, at present value, exceed the liquidation value of Lincoln's secured claim by nearly $1 million by our calculations, we conclude that the Debtor's Plan satisfies the requirements of § 1129(a)(7).

Finally, Lincoln objects to the proposed interest rate to be paid on its secured claim under the Debtor's Plan. We have already addressed this issue generally at length in *In re River Village Associates*, 161 B.R. 127, 135–39 (Bankr.E.D.Pa.1993), and specifically in reference to this case. *Union Meeting I*, 160 B.R. at 768. There has been no change in circumstances which would cause us to abandon our prior holding that, under the facts of this case, an interest rate of nine and one eighths (9⅛%) percent is adequate. This conclusion took the decision in *General Motors Acceptance Corp. v. Jones*, 999 F.2d 63 (3d Cir.1993), into account. *Union Meeting I*, 160 B.R. at 768. Therefore, we find that Lincoln has offered nothing new on this issue and its objection, as before, cannot be sustained.

2. THE VALIDITY OF THE DEBTOR'S OBJECTION TO LINCOLN'S PLAN ON THE BASIS OF 11 U.S.C. § 1129(a)(7) REQUIRES US TO DENY CONFIRMATION OF THAT PLAN ALSO.

a. LINCOLN'S PLAN CANNOT BE CONFIRMED BECAUSE IT DOES NOT PROVIDE CLAIMANTS WHO HAVE RECOURSE AGAINST THE DEBTOR'S GENERAL PARTNERS AND WHO HAVE REJECTED THAT PLAN WITH AS MUCH AS THEY WOULD RECEIVE IN A CHAPTER 7 LIQUIDATION.

The central contention of the Debtor's objections to Lincoln's Plan is that the Plan does not satisfy the requirements of 11 U.S.C. § 1129(a)(7) with regard to the Recourse Creditors. These creditors include Skippack Properties ("Skippack") and the law firm of Lesser and Kaplin, who the parties agree have claims which total about $70,000, almost all of which is attributable to Skippack's claim. Lincoln's Plan may only be confirmed if the Recourse Creditors

(i) [have] accepted the plan; or

(ii) will receive or retain under the plan on account of such claim[s] . . . property of a value, as of the effective date of the plan, that is not less than the amount that such [Recourse Creditors] would receive or retain if the debtor were liquidated under chapter 7 of this title on such date. . . .

11 U.S.C. § 1129(a)(7)(A).

The Debtor asserts that the Recourse Creditors would be paid in full in a Chapter 7 liquidation because any part of their claims not paid by the estate would be paid out of the Chapter 7 trustee's deficiency recovery from the General Partners pursuant to 11 U.S.C. § 723(a). The latter Code Section provides that, "[i]f there is a deficiency of property of the estate to pay in full all claims which are allowed in a case under this chapter concerning a partnership and with respect to which a general partner of the partnership is personally liable, the trustee shall have a claim against such general partner for the full amount of the deficiency." *See generally In re CS Associates*, 160 B.R. 899 (Bankr.E.D.Pa.1993). In light of Lincoln's own assertion of the General Partner's apparent substantial net worth of about $27 million in *Union Meeting II*, 163 B.R. at 238–40, the Debtor contends that the Recourse Creditors are entitled to full payment on their claims of about $70,000, as opposed to the thirty (30%) percent dividend provided in Lincoln's Plan.[16]

We must first determine if the Debtor has standing to raise its § 1129(a)(7) objection on behalf of the Recourse Creditors. Although the Recourse Creditors voted to reject Lincoln's Plan, they did not file their own objections to confirmation. The Debtor is not personally aggrieved by Lincoln's treatment of the Recourse Creditors, nor did

---

16. Curiously, the thirty (30%) percent dividend provided in Lincoln's Plan is greater than the best possible recovery the Recourse Creditors could secure under the Debtor's Plan. The Recourse Creditors, nonetheless, have voted to accept the Debtor's Plan. Thus, Debtor avoids the predicament now facing Lincoln. 11 U.S.C. § 1129(a)(7)(A)(i).

the Debtor provide more for the Recourse Creditors in its own Plan. *See* pages 571–72, 573 n. 16 *supra.*

There is a line of cases which holds that only creditors adversely effected by a particular plan provision may object to that provision. *See In re Westwood Plaza Apartments,* 147 B.R. 692, 699 (Bankr.E.D.Tex. 1992) ("If there has been any unequal treatment of claims, [the creditor] has benefitted from the treatment and does not have standing to object."); *In re Wonder Corp. of America,* 70 B.R. 1018, 1023 (Bankr.D.Conn. 1987) (only an "aggrieved" party may file a confirmation objection which "should be limited to those provisions of the plan which directly, adversely and pecuniarily affect the party raising the objection"); and *In re Johns–Manville Corp.,* 68 B.R. 618, 623 (Bankr.S.D.N.Y.1986), *aff'd,* 78 B.R. 407 (S.D.N.Y.1987) ("No party may successfully prevent the confirmation of a plan by raising the rights of third parties who do not object to confirmation.").

 The cases cited above, however, speak of limiting a *creditor's* right to object to a plan of reorganization. We think the situation is different when it is a debtor, saddled with a fiduciary duty to all the estate's creditors, who files an objection to a competing plan. *Accord In re Central Medical Center, Inc.,* 122 B.R. 568, 570 (Bankr. E.D.Mo.1990). In any event, most courts, including the *Wonder Corp.,* 70 B.R. at 1024; the *Johns–Manville* court, 68 B.R. at 624; and this court, *In re Richard Buick, Inc.,* 126 B.R. 840, 846 (Bankr.E.D.Pa.1991), recognize at least a limited independent duty of a bankruptcy court to ensure that a plan of reorganization meets the requirements of confirmation. *See also In re Zaleha,* 162 B.R. 309, 313 (Bankr.D.Idaho 1993); *In re Computer*

*Optics, Inc.,* 126 B.R. 664, 666 (Bankr.D.N.H. 1991); *In re Mid Pacific Airlines, Inc.,* 110 B.R. 489, 490 (Bankr.D.Hawaii 1990); and *In re Future Energy Corp.,* 83 B.R. 470, 481 (Bankr.S.D.Ohio 1988). Likewise, a plan proponent has the affirmative burden of proving that its plan satisfies the provisions of § 1129(a) by the preponderance of the evidence,[17] even in the absence of an objection. *See Rusty Jones, supra,* 110 B.R. at 373 ("Even absent the filing of an objection to a plan of reorganization, the proponent of a plan must affirmatively demonstrate that the plan is confirmable."). *Accord, Mid Pacific Airlines, supra,* 110 B.R. at 490; and *Future Energy, supra,* 83 B.R. at 481. This should be true of the § 1129(a)(7) requirement, especially as to the rights under that Code section of claimants who have voted against the plan. *See In re Landscaping Services, Inc.,* 39 B.R. 588, 590 (Bankr. E.D.N.C.1984) ("Since all of the unsecured creditors did not affirmatively accept the debtor's plan, the court must determine that the non-accepting creditors will receive more through the plan than they would receive in a liquidation under chapter 7."); and *In re Elsinore Shore Associates,* 91 B.R. 238, 270 (Bankr.D.N.J.1988). *See also Zaleha, supra,* 162 B.R. at 315–16; and *Future Energy, supra,* 83 B.R. at 489.

In order to make the comparison required by § 1129(a)(7), the plan proponent must provide the court with adequate evidence of the liquidation value of the debtor's assets. *Mid Pacific Airlines, supra,* 110 B.R. at 492; *Rusty Jones, supra,* 110 B.R. at 373; *In re Neff,* 60 B.R. 448, 452 (Bankr.N.D.Tex.1985), *aff'd sub nom. SBA v. Neff,* 785 F.2d 1033 (5th Cir.1986); and *In re Featherworks Corp.,* 25 B.R. 634, 642–43 (Bankr.E.D.N.Y. 1982), *aff'd,* 36 B.R. 460 (E.D.N.Y.1984).[18]

---

17. There is some debate whether the proper standard of proof in this situation should be by the preponderance of the evidence or by clear and convincing evidence. *See generally In re Briscoe Enterprises, Ltd., II,* 994 F.2d 1160, 1164–65 (5th Cir.1993), for a thorough discussion of this debate. We find those cases espousing the less demanding preponderance of the evidence standard to be more convincing. *See, e.g., id.* at 1165. *Cf. In re Rusty Jones, Inc.,* 110 B.R. 362, 373 (Bankr.N.D.Ill.1990).

18. The liquidation analysis contained in the Disclosure Statement accompanying Lincoln's Plan, at 37–38, is minimal. Lincoln relies on its own unspecified analysis and determination, along with the alleged analysis and determination of Debtor and this court, that "the present estimated liquidation value of the Debtor's Assets will ultimately realize for the Impaired Unsecured Creditors ... less than the amounts the Impaired Unsecured Creditors will receive under Lincoln's *Second* Amended Plan." *Id.* (emphasis added). Needless to say, this court has made no such

■ Because a bankruptcy court should consider the value of a § 723(a) recovery when calculating the liquidation value needed for the § 1129(a)(7) comparison, H.R.Rep. No. 595, 95th Cong., 1st Sess. 412 (1977) U.S.Code Cong. & Admin.News 1978, p. 5787, a plan proponent should also provide evidence of the net worth of a partnership debtor's general partners. *See 222 Liberty Associates, supra,* 108 B.R. at 987–89 ("[W]e believe that ... a partnership generally should disclose its general partners' personal assets and liabilities to comply with § 1129(a)(7)(A)(ii)"). *See also In re M. Long Arabians,* 103 B.R. 211, 216–17 (Bankr. 9th Cir.1989) ("In order to apply the 'best interests' test and determine the amounts [that a particular creditor] would receive on its claims in a Chapter 7 liquidation, additional information is needed regarding the ability of ... [the] general partner ... to contribute assets to the estate."); *In re Diversified Investors Fund XVII,* 91 B.R. 559, 562–63 (Bankr.C.D.Cal.1988) ("[I]n order for me to make the § 1129(a)(7) finding and for the unsecured creditors to have adequate information to make an informed decision whether to support or reject the plan, debtor must include the net worth of general partners in the liquidation analysis in the disclosure statement since only then will the court and unsecured creditors have the information necessary to make an informed decision."); and *In re I-37 Gulf L.P.,* 48 B.R. 647, 650 (Bankr.S.D.Tex.1985) ("[I]t is necessary for the Court to determine the net worth of each of the partners of the partnership, in order to determine whether a plan can be confirmed under § 1129(a)(7) of the Bankruptcy Code."). *Cf.* Federal Rule of Bankruptcy Procedure 1007(g) ("The court may order any general partner to file a statement of personal assets and liabilities within such time as the court may fix.").

In this case, we have already held that the General Partners' aggregate net worth was in the neighborhood of $27 million at the time that the Debtor filed its bankruptcy case. *Union Meeting II,* 163 B.R. at 238–40. Indeed, we held that the General Partners'

assets exceeded the sum of the Debtor's liabilities by about $10 million. *Id.* at 239–40.

■ Lincoln, as a proponent of the successful contention that the General Partners had sufficient assets to negate the conclusion that the Debtor was insolvent in *Union Meeting II,* does not dispute the apparent financial well being of the General Partners. Rather, it argues that its Plan "expressly preserves creditors' rights to pursue the General Partners." Lincoln's Brief, at 41. More specifically, Lincoln argues that its Plan satisfies § 1129(a)(7) because it provides that confirmation will not release or discharge the General Partners. Lincoln's Plan, at 18.

In support of its contention that the Plan's "preservation" of the creditors' individual causes of action against the General Partners is the same as the Chapter 7 trustee's cause of action under § 723(a), Lincoln cites *In re Heron, Burchette, Ruckert & Rothwell,* 148 B.R. 660 (Bankr.D.C.1992). We find that this case can be distinguished. In the *Heron* case, certain creditors objected to the debtor's plan, claiming it did not meet the best interests of creditors' test of § 1129(a)(7). *Id.* at 677. Specifically, the creditors objected to the debtor's inclusion of $532,500 in its calculation of the amount received or retained by the creditors under the plan because that sum represented the possible recovery of the creditors which would result from their own "independent actions" against the debtor's general partners, and, therefore, could not be weighed equally with the same sum which would be recoverable by the hypothetical Chapter 7 trustee under § 723(a). *Id.* at 677–80. The bankruptcy court disagreed, stating that,

> [i]n applying the best interest test, the court should consider not only property received under the plan on account of a claim but also property "retain[ed] under the plan on account of such claim." 11 U.S.C. § 1129(a)(7)(A)(ii). This plan ... reserves for creditors their rights ... to proceed against the property of the non-

determination regarding Lincoln's current Plan. Nor would it be appropriate for us to do so prior

to the hearing on confirmation.

participating partners. For this reason, the court believes that the creditors are effectively retaining the $532,000.00 determined to be the available net worths of the non-participating partners....

Under the plan, the debtor has assigned its rights against the non-participating partners to the Creditors Committee. These rights include the right to contribution from partners should the debtor's liabilities exceed its assets.... As a result of the debtor's assignment, the Creditors Committee has the debtor's right to bring contribution actions on behalf of the debtor against the non-participating partners. Any amounts collected in such actions become property of the estate to be distributed under the plan. *This mechanism protects those creditors whose claims are too small to warrant bringing their own actions.*

The right of the Creditors Committee to pursue non-participating partners is at least as extensive as the right of a chapter 7 trustee of the partnership to pursue § 723 claims.... Although costs will be incurred in Creditors Committee suits, *there is no evidence that they would significantly differ from the costs that a chapter 7 trustee of the partnership would incur in pursuing actions under 11 U.S.C. § 723 and in pursuing a claim in any chapter 7 case of the individual partner.* Thus, the court concludes that the entire $532,000 ought to be included in the liquidation analysis.

*Id.* at 681–82 (footnote and citations omitted) (emphasis added).

There is an important distinction between the recourse claims of individual creditors of a partnership against the general partners and a contribution action by a debtor/partnership against its general partners, as is suggested by reference to the passages from *Heron* emphasized above. A suit by a Chapter 7 trustee under § 723(a) is nothing more than a contribution action. Thus, in the *Heron* case, when the Debtor assigned its right of contribution to the creditors' committee, the court held that the assigned claim equalled the hypothetical § 723 action. *Id.* at 682. On the other hand, a recourse claim by

an individual creditor, which is presumably available to that creditor at any time notwithstanding the partnership's bankruptcy, may well be prohibitively expensive. Indeed, the *Heron* court made a point of analyzing the costs of a contribution claim in the hands of a creditors' committee as compared to a § 723(a) action by a Chapter 7 trustee. *Id.* Once convinced that the costs would be similar, the court was satisfied that the debtor's contribution claim assignment "mechanism protects those creditors whose claims are too small to warrant bringing their own actions." *Id.* Such protections are not present when each individual creditor has to pursue its own claim against the individual general partners. The practical result may well be that the individual cause of action is worthless even if the collective action would bear fruit.

We conclude that the individual causes of action retained by the Recourse Creditors under Lincoln's Plan are less valuable than the right to share in the recovery of a § 723(a) action brought by a Chapter 7 trustee, or, for that matter, a contribution action brought by a creditors' committee or the Debtor itself in a Chapter 11 case. Therefore, Lincoln's Plan does not satisfy the requirements of § 1129(a)(7) and cannot be confirmed under § 1129(a) or § 1129(b).

### b. THE DEBTOR'S REMAINING OBJECTIONS TO LINCOLN'S PLAN ARE WITHOUT MERIT.

The Debtor reiterates, almost verbatim, certain objections which were unsuccessfully invoked against the prior version of Lincoln's Plan. Specifically, the Debtor contends that the General Partners have made valid loans to the Debtor, and, therefore, hold valid unsecured claims which should be included in Class 5 of Lincoln's Plan. Because Lincoln has scheduled the General Partners in Class 6, containing equity interest holders, the Debtor argues that Lincoln's Plan discriminates unfairly and is not "fair and equitable" under either 11 U.S.C. § 1129(b)(2)(B) or § 1129(b)(2)(C). We have already held that the General Partners' so-called loans are, in fact, equity contributions. *Union Meeting I, supra,* 160 B.R. at 773–75. The Debtor has offered no new evidence which convinces us

to change our mind. The other objections, the most prominent of which are noted at page 559 *supra*, were all disposed of in *Union Meeting I*, 160 B.R. at 770–73, 775, and, as the law of the case, *see River Village, supra*, 161 B.R. at 134, will not be revisited. Indeed, possibly acknowledging the weakness of these objections, the Debtor does not even discuss them in its Brief.

*D. CONCLUSION*

 Once again, we are unable to confirm either the Debtor's Plan or Lincoln's Plan. Like its last attempt, Lincoln's Plan just misses the standard for confirmation. The only basis for denying confirmation of this Plan is the potential of the General Partners' contribution, an issue which was not raised in *Union Meeting I* and arose largely because of factual assertions regarding the General Partners' assets which Lincoln itself raised for the first time in the course of litigating *Union Meeting II*. Lincoln therefore deserves one more opportunity to prepare a confirmable plan. *See Union Meeting I*, 160 B.R. at 775–76.

 On the other hand, each successive Plan proposed by the Debtor has flown further and further from the mark. We are now convinced that the Debtor cannot propose a confirmable Plan unless it is succeeds in having at least one of our prior decisions reversed on appeal, and there is no indication that this is likely. Therefore, we will not provide the Debtor with any further opportunity to submit a confirmable plan. *See River Village, supra*, 161 B.R. at 142–43.

Finally, if Lincoln declines our invitation, or is unable to correct the deficiencies of its current Plan, we will forthwith convert this case to a case under Chapter 7.

*ORDER*

AND NOW, this 14th day of March, 1994, after a consolidated hearing of January 23, 1994, to consider whether we should confirm the Third Amended Plan of Reorganization proposed by the Debtor ("the Debtor's Plan") over the objections of Lincoln National Life Insurance Company ("Lincoln") thereto; or whether we should confirm the Second Amended Plan of Reorganization proposed by Lincoln ("Lincoln's Plan") over the objections of Debtor thereto, into which we incorporated the record of prior hearings on July 29, 1993, and September 9, 1993, at which we considered confirmation of various earlier versions of the parties' plans, and upon consideration of the Briefs submitted by the parties in support of their respective positions, it is hereby ORDERED AND DECREED as follows:

1. Confirmation of the Debtor's Plan is DENIED.

2. Confirmation of Lincoln's Plan is DENIED.

3. Lincoln may file a further Amended Plan consistent with the accompanying opinion, along with an accompanying Amended Disclosure Statement, or a supplement to its prior Disclosure Statement describing the changes from its prior Plan. If Lincoln chooses to file a further Amended Plan, it shall serve black-lined copies of same upon counsel appearing on the attached Service List and the court in chambers, and it shall notify all interested parties of the filing of the Disclosure Statement or amendment thereto on or before March 25, 1994.

4. A hearing on the adequacy of the Disclosure Statement or amendment thereto, if necessary, shall be scheduled on

WEDNESDAY, APRIL 20, 1994, at 9:30 A.M. and shall be held in Courtroom No. 2 (Room 3718), United States Court House, 601 Market Street, Philadelphia, PA 19106.

5. If no further Amended Plan is filed and served as directed herein, this case will be converted to a Chapter 7 case without further notice or hearing.